Johnston *v.* Orcutt et al., Appellant.

Argued October 26, 1931.

Before TREXLER, P. J.,
KELLER, LINN, GAWTHROP, CUNNINGHAM and BALDRIGE,
JJ.

*John M. Reed,* and with him *Edward T. Kelley,* for
appellant.—A claimant has the burden of proof to
establish the causal connection between the alleged ac-
cident and the death: Fink v. Sheldon Axle & Spring
Company, 270 Pa. 476; Gausman v. Pearson Company,
284 Pa. 348; Luckenbill v. Phila. & Reading C. & I.
Co., 93 Pa. Superior Ct. 438.

*Frank G. Smith,* and with him *A. M. Liveright,* for
appellee, cited: Vorbnoff v. Mesta Machine Co., 286 Pa.
199; Ford v. Dick Company, 288 Pa. 140.

OPINION BY CUNNINGHAM, J., November 20, 1931:

Reid Johnston, claimant's husband, developed endocarditis, accompanied by blood stream infection and fibrosis, which terminated fatally August 25, 1930. Compensation was claimed on behalf of his dependents upon the ground that there was a causal connection between his death and an accident suffered by him on April 16th of that year, while employed as an automobile mechanic by the E. E. Orcutt Garage. Claimant had the burden of showing this alleged connection. There was undisputed evidence that decedent had been treated intermittently by his family physician during a number of years for "nose, throat and ear conditions," and in February, 1929, was operated on for "acute pneumococci mastoiditis." Notwithstanding these indications of infection there was evidence by decedent's fellow employes that during his employment in this garage (approximately a year prior to the incident hereinafter referred to) decedent "worked regularly......and when we needed a man he worked extra" and was apparently "a very rugged man and strong."

The accident which claimant alleges aggravated and accelerated any infection with which her husband may have been suffering and brought about his demise was the accidental inhaling by him on April 16th of noxious gases while engaged in repairing an old automobile. His immediate superior testified: "A. I put him [Johnston] to work on a used car and he was working on this used car over the motor. He was working on the muffler and all around the car. It was an old car and smoking all around the valves. He was working away there; of course I had other work to look after, and I was in and out all the time. I just came back from some place and saw him leaning over the bench. I went over and asked him how he was coming and he said, 'I'm pretty sick.' I went on then, or somebody called me. I came back then and

I don't remember whether I shut the motor down or somebody else shut it down, but he didn't do any more work. He was played out and he just layed around there for an hour, I suppose. ...... Q. Did he tell you at that time he had been gassed while working on this motor? A. Well, he said he felt pretty sick and I could tell by the smell around there that there was gas there, with the oil burning and the old gas from this car. In fact, I had a headache with it myself. ...... Q. Did he look sick to you? A. You bet he did. He was very pale. Q. He was working over this bench, was he, over at the window when you saw him? A. Yes, leaning over the bench towards the window.'' A fellow mechanic testified that Johnston and he were working on cars; that he noticed Johnston leaning over the bench and when the witness asked "What's the matter, Reid?" decedent said "he was gassed;" the witness added, "He got sick and he was awful white and pale.'' This occurred about four o'clock on a Wednesday afternoon. His foreman stated Johnston did not finish the job but "layed around there until quitting time;" did not return to work until the following Monday, after which he worked until May 3rd; did not work from the third to the tenth; worked again from May 10th to June 9th; was off from June 9th to 16th and then worked until June 27th, the last day he was able to work. Referring to his ability to work subsequent to April 16th this witness said: "He was not dependable after that. I would put him on a job and he would just work at it half-heartedly. I would have to keep after him. But before that, I never did. I never had to keep after him before that,'' and added that decedent continued to weaken from the time of the accident until he quit work entirely.

That an injury or death resulting from accidental inhalation of noxious gases from an automobile is compensable cannot be doubted: Pataky v. Allen Motor Co., 100 Pa. Superior Ct. 343, and Green v. Hiestand

Brothers, 103 Pa. Superior Ct. 515. As we view this case, the issue was whether the death of the employe occurred in an ordinary way, natural to the progress of the disease with which he was afflicted prior to April 16th, or whether the inhalation of noxious gases in the course of his employment on that date aggravated a preexisting and chronic diseased condition of his heart and lungs and accelerated its fatal termination. If his demise was brought about by an injury accidentally suffered during the course of his employment, the fact that he had a chronic ailment, which rendered him more susceptible to such injury than an ordinary person would be, will not defeat the right to compensation: Jones v. United Iron and Metal Co., 99 Pa. Superior Ct. 394.

The medical testimony upon the vital issue in the case was irreconcilably conflicting. The referee concluded that its weight was that the "fumes inhaled by decedent on April 16th did not contribute either directly or indirectly" to his death, and accordingly disallowed compensation. The board, upon appeal to it, took no additional evidence, but, upon analyzing and balancing the testimony before the referee, set aside his findings and conclusions and substituted its own to the effect that the weight of the evidence was that decedent had a chronic lung ailment prior to the accident which was aggravated and accelerated by an injury to the lungs caused by inhaling the gases; that the injury was the superinducing cause of the endocarditis and fibrosis; and that the fumes inhaled "contributed directly" to the death of the employe. The court below dismissed the carrier's appeal and entered judgment on the award of the board.

The issue was one of fact and the legislature has committed the final decision thereof to the compensation authorities. Upon this appeal, it is not our function to weigh the conflicting testimony of the medical witnesses; the sole power conferred and duty

imposed upon us is to ascertain whether there was evidence legally competent to sustain the findings of the board, and whether the law has been properly applied to those findings: Puza v. P. & R. C. & I. Co., 98 Pa. Superior Ct. 139. Obviously, the professional opinions of physicians who examined and treated decedent during his last illness constituted competent evidence upon the issue. Dr. E. S. Erhard, decedent's family physician for 15 years, testified that Johnston called upon him during the latter part of April, 1930, and was treated for a bronchial irritation; this witness expressed the opinion that breathing a noxious gas would aggravate and accelerate such a condition. Dr. L. C. Rowles testified he treated Johnston from the latter part of May until the middle of July, 1930. Excerpts from his testimony read: "Q. Did you make an examination of him? A. Yes, sir. Q. Will you state the result of your examination, Doctor? A. Physical examination showed dull areas over his lungs, an endocarditis, arthritis and muscle inflammation. At the first examination, his sputum showed streptococci. That is what he was spitting out of his lungs. His blood count was 2,500,000 red cells, and 18,000 whites, with a hemoglobin of fifty percent. Q. Now, did he give you a history, Doctor, of his case? A. I naturally took a history of him. He gave me a history of having been working around a car in April and felt sick and got up and went to lean over a workbench at a window, and he said that for a while he didn't know anything. I asked him how long he was there and he didn't know. Of course, the man was unconscious. He had been sick from that date on. Q. What did you determine, Doctor, was the cause of this condition you found him in? A. I determined that his lungs had been injured from inhaling noxious gases. Q. That his lungs had been injured? A. Yes, sir. Q. And that brought on these other things, is that your

opinion? A. That made the open wound in his lungs upon which the infection had been planted. The infection travels from the lung to the blood stream and various parts of the body which accounts for the heart lesion. It accounts for his empyema that he was unable to overcome ...... Q. Doctor, you have heard these witnesses testify as to what took place in that garage. Would you say, in your professional opinion, that his condition when you saw him and the resultant death was due to that cause, to that gassing? A. Yes, I attributed his condition to the inhaling of those noxious gases at that time. Q. But would you say his subsequent death was due to that injury? A. With the complications that developed on top of it, yes. ...... Q. In other words, this gassing was the primary cause, and the infection set in from the gassing? A. The gassing gave the injury to the lung and the avenue for the infection to get into his system. Q. Would you say, Doctor, if he had not had this gassing, he would not have died as he did, if he hadn't had this injury? A. No, I attributed, in my professional opinion, this gassing was the cause of his death, because that was the beginning of his trouble. That was the beginning of his trouble. That was the injury he received. Q. You say, then, Doctor, in your professional opinion, this gassing was the cause of his death? A. Yes, sir, as a primary cause." The claimant called Dr. A. D. Cowdrick as a medical expert; he had not examined the decedent but was in attendance at the hearing and had listened to the testimony up to the point at which he was called. The material portion of his testimony follows: "Q. Doctor, have you heard the testimony of the various witnesses called here, the laymen as to how the accident took place and the Doctors as to what the result and cause of death was and what they found? A. I have. Q. Doctor, in your professional opinion, what would you say the pri-

mary cause of this man's death was? A. Taking into consideration the history of the employee and the findings of the physicians, I would say that the gassing was the primary cause. Q. Will you explain how you arrive at that conclusion, Doctor? A. Well, from the experience I have had in driving an automobile all over the country, you get all the old gases from a car of that kind. You are not limited to carbon monoxide, you get soot and various particles of rust, which would be irritating to the lungs and which would set up an inflammation, a chronic inflammation of the lung. When you get that you will open up an avenue for infection. It may be bronchitis followed by streptococci infection, the same as when you would get an injury to the hand. An incised wound doesn't kill anybody, it is the infection which enters through the wound. If they don't have any open wound, you wouldn't have the infection, and the same thing applies to this case. Q. This would be a similar case, as it opens up the place for the infection to start? A. Yes, it opens up the avenue for the infection.''

We think this evidence measures up to the tests prescribed by the decisions of our Supreme Court and of this court and sufficiently sustains the findings of fact by the board. True, other physicians who examined decedent in the hospital and made a post mortem examination expressed opinions in sharp disagreement with those we have quoted and were supported by the testimony of an expert called by the carrier, but it is not for us to say which set of opinions should have been adopted by the board.

The application of the law to the findings of the board required an award to the dependents, and the assignments of error are accordingly overruled.

Judgment affirmed.