Curcio *v.* Bendik et al., Appellants.

Argued April 17, 1933. Before TREXLER, P. J., KELLER, CUNNINGHAM, BALDRIGE, STADT-FELD, PARKER and JAMES, JJ.

*L. A. Nunnink* of *Meyer & Nunnink,* and with him *Francis A. Wolf* and *H. S. Dumbauld,* for appellants.

*E. D. Brown,* for appellee.

OPINION BY JAMES, J., July 14, 1933:

This is an appeal from the order of the court of common pleas of Fayette County, affirming the decision of the referee and compensation board in dismissing the petition for termination of compensation presented by the employer and insurance carrier.

Frank Curcio, the employee and claimant, was injured on September 10, 1929, while engaged on a construction job. While holding a guide line on the second floor of a building a five hundred pound piece of iron fell and struck him on the left chest. The impact caused him to fall through the joists on which he was standing down to the floor below, a distance of about thirteen feet. After he fell, he was unconscious for about ten minutes. Since the accident claimant has not been employed but prior thereto he had been regularly employed and apparently in good health.

Claimant entered into an agreement on October 21, 1929 for payments of $15 per week for total disability which continued from September 17, 1929 to February 1, 1930. From this latter date, under

order of the referee dated April 10, 1930, he was awarded compensation for partial disability at the rate of $7.50 per week, based on the conclusion that he was disabled to the extent of 50%. On June 25, 1931, defendants presented a petition alleging that all disability had terminated and that claimant had fully recovered from the disability suffered as a result of the accident and asked that the compensation agreement be terminated. A hearing was held but the referee dismissed the petition on the ground that defendants had failed to meet the burden of proof sufficient to establish their case. This was affirmed by the Workmen's Compensation Board and the appeal to the court of common pleas was dismissed.

The petition to terminate was filed under the second paragraph of Section 413 of the Act of April 13, 1927, P. L. 168, which reads as follows: "The board or referee designated by the board may at any time...... terminate ...... an ...... award, upon petition filed by either party with such board, upon proof that the disability of an injured employee has ...... finally ceased," under which section the burden of establishing that the disability has ceased is upon the petitioners, in the instant case, the employer and insurance carrier.

Upon this appeal it is not our province to weigh the evidence presented before the referee and reviewed by the board; our only inquiry is whether there was evidence competent in law to support the findings and whether on such findings the law has been properly applied: Kuca v. Lehigh Valley Coal Co., 268 Pa. 163, 110 A. 731; Vorbnoff v. Mesta Machine Co., 286 Pa. 199, 133 A. 256; Puza v. P. & R. C. & I. Co., 98 Pa. Superior Ct. 139; Nych v. Pressed Steel Car Co., 103 Pa. Superior Ct. 325, 158 A. 281; Johnston v. Orcutt Garage, 103 Pa. Superior Ct. 507, 157 A. 46. The issue was one of fact and the legislature has committed final

decision thereof to the compensation authorities. The sole power conferred upon us is to determine whether there was legally competent evidence to sustain the findings of the board and whether the law has been properly applied to those findings.

The only testimony adduced was medical testimony. Dr. W. A. Caven and Dr. W. C. Hendricks were witnesses for the defendants, and each of them saw the employee on but one occasion. Dr. H. E. Ralston testified for the claimant and he had examined the employee on at least four occasions. The following is a condensed statement of the testimony of defendants' doctors as appears in the opinion of the court below showing that claimant was suffering from: "1. Hypertension (high blood pressure); 2. chronic myocarditis (a chronic disease involving the muscles of the heart); 3. arteriosclerosis (hardening of the arteries); 4. chronic hypertropic emphysema (a lung condition due to infection); 5. chronic hypertropic osteoarthritis (deposit on the various vertebrae of the spine, due to infection); 6. oral sepsis, or an infected condition of the mouth. Dr. Caven testified that the apex of the heart was down below the seventh rib, showing that the heart was very much enlarged; and that he found that the claimant suffered great pain when he would bend or flex him to the left, and also when he stooped forward he suffered pain. Dr. Hendricks testified that the trauma would have stirred up the chronic osteoarthritis with which the claimant was suffering at the time of the accident. He also testified that the effect of sufficient trauma might convert a chronic infection into a sub-acute infection." In the opinion of defendants' physicians, these conditions are the cause of the complaints and disability of the claimant; that the conditions found antedate the accident of September 10, 1929, and that the accident and injuries sustained by the claimant would aggravate

his chronic conditions temporarily but that at the time of their respective examinations, claimant had fully recovered from the effects of his accident and injury, but was totally disabled from doing any hard work, due entirely to his chronic conditions. Defendants' contention is that having established by medical testimony that claimant was not then suffering from any disability as a result of the accident, a prima facie case to terminate should be held to be established and should prevail unless overcome by the claimant. We must agree that if this testimony was undisputed and uncontradicted, it would have established that disability as a result of the accident had ceased but it is opposed by the medical testimony of claimant's witness, whose testimony must be considered with the medical testimony of defendants to determine whether his present disability was in any way attributable to the accident which was solely a question of fact to be determined by the referee and reviewed by the board. The testimony of Dr. Ralston, claimant's medical witness is in part as follows: (page 55a) "Q. I will ask you, in your professional opinion, taking into consideration that this man had worked regularly prior to the date of the injury; that on or about September 10, 1929, a steel beam weighing 500 lbs. struck him in the side after it had fallen fourteen or sixteen feet—throwing the claimant a distance of from fourteen to sixteen feet—whether or not in your professional opinion he is able to perform work that he was accustomed to perform before the injury? A. I will answer that no. Q. Will you state whether or not you think his present condition has been aggravated by the injury? A. What do you mean by his present condition? Q. His present disability? A. You mean the injuries he sustained keeping him from working? Q. Yes. A. Well, I would say they have something to do with it—not altogether." (page 56a) "Q. What did you

find his condition to be the various times you examined
him? A. You mean the first time? Q. Yes? A. Well,
the first time he complained of pain in his back and
he could not bend or twist or move from side to side.
After some time, I don't know how long, probably 4
to 6 months, he didn't complain of his pain so much,
although he had some disability but not as much as
in the beginning, but the pain he complained of mostly
was in his left chest along the lower border; I would
say probably the pain was overlooked; he complained
of pain being over where he had these fractured ribs.
Q. And you said he could not move to the left? A. He
could move but his motion was somewhat limited?
Q. And did that condition exist each time you ex-
amined him? A. The motion in his back cleared up
somewhat, at least he seemed able to do a little more
than in the beginning although every day I examined
him he complained of this pain in his chest, and in
my opinion that pain he complained of in his chest
seemed to limit his motion more than his back con-
dition." (page 57a) "Q. To what did you attribute
the pain and suffering and the medical conditions that
you found? A. Well, most of his pain I would attrib-
ute— and the pain he complained of mostly was in
his left chest, and with the history and with the X-ray
findings I would say that probably his injury had a
lot to do or mostly to do, with the pain he complained
of in his left chest. Q. Would you say the pain or
condition you found in his left chest would be the prob-
able consequences of the injury he sustained on Sept.
10, 1929? A. I would say from the history and
physical findings, yes. Q. And when did you examine
him the last time? A. I would say within the last ten
days. Q. And were the conditions then practically
the same of the pain you described, in his left chest?
A. Yes. Q. And do I understand your history em-
braces the period of time you first examined him up
until now? A. Yes." (page 58a) "Q. That his con-

dition was the result of the injuries? A. Yes. Q. In other words his injuries in your professional opinion produced his present condition? A. Aside from all the medical conditions, I would say yes. Q. Doctor, is it your professional opinion that his present condition is a result of the injuries of September 10, 1929, the pain and suffering in his left side? A. I would say it would, yes." (page 59a) "Q. What conditions does he have today that the injury is the cause of? A. I said the condition he has today is this pain in his chest and suffering he complains of aside from the medical conditions. Q. Now, Doctor, what is the— what is causing the pain in his chest? A. From the history and from the physical findings— physical examination and from the X-ray findings, naturally I have to say it's caused by this injury he sustained." (page 67a) "Q. So then all the conditions and things he now complains to you about could be, so far as you know from your physical findings, directly responsible for the myocarditis, is that right? A. They could be due to this myocarditis." (page 68a) "Q. Could they be as a result of the myocarditis which he now has? A. No. Q. Why? A. From the location of the pain in his chest; the pain I found was directly palpation and feeling, over his ribs; that is where I found his pain, where his ribs were fractured. Another thing a heart condition will not give a man pain on twisting his body from one side to another, as the doctor stated this afternoon, bending over to his left side. Q. You don't know whether the pain is coming from the heart or the old fracture or whether it's coming from the osteoarthritis? A. When a man gives you a history of having had two broken ribs and complains of pain over the seat of fracture of those ribs, naturally I am going to think that the pain is coming from the seat of fracture in preference to thinking it's coming from some heart condition. Q. Well, had those

fractures healed? A. He has good callus there, good union. Q. And perfectly united? A. Absolutely. Q. Then, Doctor, it's possible this pain he reports there and you refer to, could come from his heart? A. No. Q. Why? A. Because it does not.''

From the above testimony, it was clearly a question of fact whether the claimant was suffering any disability as a result of the injury and that fact was to be determined solely by the referee and the board and we are satisfied that the referee was justified in finding that defendants failed to prove the allegations set forth in their petition and that claimant is still suffering from the injuries received on September 10, 1929 and is unable to work. All the proofs and inferences to be drawn from the testimony were matters for the referee and the compensation board and it is not for us to say whom the referee and the board must believe. There being competent evidence to show that claimant's present condition is the result of the injury, we can not substitute our judgment for the judgment of the referee and the board. Judgment affirmed.