ROESSLER & HASSLACHER CHEMICAL CO. v. PETERSON.

(Circuit Court of Appeals, Third Circuit.   February 6, 1905.)

No. 50.

MASTER AND SERVANT—INJURY OF SERVANT—ASSUMED RISK.

> While plaintiff, who had been employed for eight years as a general laborer in and around defendant's manufacturing plant, was slacking lime to make whitewash with which to spray the inside walls of a new building—using for the purpose an old sheet-iron drum, 18 inches deep and 12¾ inches in diameter—he poured too little water at a time upon the lime, causing it to suddenly vaporize. by which it was thrown out of the vessel into his face, and he was injured.   He was 40 years old. of ordinary intelligence, and had worked at various employments; and he and his co-employé had been engaged in the whitewashing, off and on, for a month or more.   Whether they selected the drum themselves. or were directed to use it by their foreman, was in dispute.   *Held*, that the work was within the general scope of plaintiff's employment, the risks of which he assumed; that the danger of such an accident in slacking lime was one of which defendant had no greater means of knowledge than plaintiff, it not being shown that it had occurred before; and that defendant could not be charged with liability for the injury, either on the ground that it failed in its duty to instruct plaintiff, or because it furnished him the drum for use, it not appearing that the explosion would not have occurred from the same cause, had any other vessel been used.

> [Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 297–300, 305–309.

> Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

In Error to the Circuit Court of the United States for the District of New Jersey.

Charles C. Hommann, for plaintiff in error.

George S. Silzer, for defendant in error.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge.   This case comes up upon writ of error to the Circuit Court for the district of New Jersey, to review a judgment entered therein against plaintiff in error, upon a verdict of a jury for $8,000 damages, besides costs.   We will speak hereafter of the plaintiff in error as the defendant, and the defendant in error as the plaintiff.

The suit in the court below was an action in tort, founded upon the alleged negligence of defendant company, which resulted in injury to the plaintiff.   The facts, as disclosed by the record, are that the plaintiff, at the time of the accident, in February, 1903, had been employed

by the defendant company for more than eight years, to do and perform such work and services at the chemical works of said defendant company, "as should be directed and required of him as a laborer." His wages were $9 a week. He says in his testimony, that he first worked for about six months inside the factory, as a fireman at a gas generator, afterwards outside in the yard, under the foreman of the yard gang. "My duties in the yard were unloading cars and loading, and sweeping, and all things that I was ordered to do to keep things in condition outside of the factory." He afterwards says, in explanation of the character of his work as a laborer, that he was in the chloride of lime gang, where they manufactured chloroform. "Q. What did you there? A. Worked in that lime and run the chloroform out of the kettles." Plaintiff testifies that before he came to the works of the defendant company, he worked in a clay bank; that he afterwards worked six years in the Perth Amboy Terra Cotta Company; that he also worked at an emery mill. "Q. What work did you do in the clayworks? A. Worked in the brickyards, setting kilns and spraying. Q. How did you spray there? A. With the regular clay mixed up with water." That he worked for a mason for a couple of days, and helped slack lime for mortar. About a month before the accident, by the direction of the yard foreman, the plaintiff and another laborer undertook to slack lime and make whitewash, which they used in spraying the inside of the walls of a new brick building. The lime was slacked and the whitewash made just outside the building, in a sheet iron vessel or drum, about 18 inches high and 12¾ inches in diameter. These drums had been used for chloride of lime in the manufacture of chloroform, and plaintiff testified that he was familiar with them, and had handled them when so used; that when they were discarded as old and unfit for that use, they were around the yard, and were used sometimes as receptacles for ashes and other waste material. He also says that it was at the suggestion of the foreman, that one of these discarded drums was used to slack the lime in and prepare the whitewash for spraying. The foreman denies this, and says in his testimony:—"They slacked the lime by my order in a half barrel,—an old kerosene barrel, that was standing in the yard a long while full of water. I gave the order to Teiss (a fellow workman) to cut that barrel in half, to slack lime in, which the men did; I seen it myself as they slacked the lime in that barrel," and that they changed to the drum without his orders. The two men were engaged at this work, off and on, for about a month before the accident, the one slacking the lime and making the whitewash, and the other doing the spraying of the walls inside the building, and alternating in this. Plaintiff says he had made whitewash once before in a trough, and that he had made it seven or eight times during that month in this metal drum. The foreman testifies, in answer to the question as to what he said to plaintiff when he set him to work, that he asked him whether he knew how to slack lime and whitewash, and he said yes, he had done it many times. After they had been so engaged, off and on, during five or six weeks, plaintiff, in order to slack some lime, put a couple of shovels full into the drum. He then poured about half a pail full of water upon it, just enough to cover the lumps of lime. When it started slacking,

he took a stick and stirred it around, and then when the water dried from it, he poured about half of what was left of the pail full of water and then stirred it again. He then poured the rest of the water upon it, when an explosion occurred, throwing the lime into his face and eyes, as he stood over it. It was for the alleged negligence of the defendant company, in directing the plaintiff to slack the lime in the receptacle described, without warning him of the special danger incurred thereby of an explosion, such as actually happened, that damages were claimed by the plaintiff.

There was no proof or testimony of any kind, tending to show that the defendant company had knowledge of, or was informed that, such special danger attended the process of slacking lime in the receptacle described, or in any other. Nobody connected with the works, including the plaintiff, testified that he knew of any such special danger, or that such an explosion in slacking lime had ever occurred before, in receptacles of that kind, or any other. Two of the witnesses employed in the works testified to slacking the lime in just such vessels. Three or four witnesses were produced in behalf of the plaintiff, who testified as experts, that the drum in question was not a safe vessel in which to slack lime, and two or more experts were produced on behalf of the defendant, who testified that they considered the drum in question a safe and fit receptacle for the slacking of lime. The court, refusing the peremptory instructions, asked for by defendant's counsel, charged the jury generally, and submitted to them the case. Defendant excepted to the refusal to instruct peremptorily in its favor, and to certain portions of the charge to the jury, and the verdict and judgment having been rendered in favor of the plaintiff, we have here to consider the assignments of error founded upon these exceptions.

The view we take of the assignment of error, directed to the refusal of the court to give peremptory instructions to the jury to find a verdict for the defendant, makes it unnecessary that we should consider the other assignments, founded upon exceptions to the admission of testimony and to certain portions of the charge delivered by the trial judge to the jury.

The Supreme Court has repeatedly approved the proposition, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not literally, whether there is any evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, and upon whom the onus of proof is imposed. Pleasants v. Fant, 22 Wall. 116, 22 L. Ed. 780; Marion County v. Clark, 94 U. S. 278, 24 L. Ed. 59.

A careful reading of the evidence sent up to us by the bill of exceptions, and consideration of the facts established thereby, and undisputed, convince us that this case should not have been submitted to the jury without peremptory instructions to find for the defendant. It is not denied that the plaintiff in this case, a man of mature years, was of fair intelligence, and had undertaken, in the usual and customary way, the duties of a common laborer and man of all work, in and around the premises of defendant, to do and perform such work and services as, in the language of the plaintiff, "should be directed and required of him as a laborer." His wages were $9 a week, and up to the average paid

to laborers of his class. He was 40 years of age, and was undoubtedly a man of varied experience, as attested by the work in which he had been employed, both previous to his engagement by the defendant and during his 8 years of service with it.

We cannot, in the light of the evidence, regard whitewashing, and the slacking of lime as incident thereto, as outside the scope of the general employment of such a laborer as the plaintiff is proved to have been. He must, therefore, be considered to have assumed the risk incident to his employment. Whitewashing, and the slacking of lime for that purpose, is one of the commonest of domestic services. No special skill or training, and the slightest experience only, are required to perform it. That heat and steam are evolved in the slacking of lime, is almost as much a matter of common knowledge as that boiling water will produce steam, and it cannot be seriously contended that any special duty of protection is owing by the employer to a laborer of mature years and intelligence, who assumes, upon request, the work of slacking lime for the purpose of whitewashing. The employer, in this case, is not to be complained against for assuming that such a man understands, as well as the employer, all that is necessary to be understood about the work he undertakes. This, we think, is in accord with the well-settled doctrine of the numerous cases dealing with the law of master and servant, and the assumption of risk of employment by the servant. But it is urged on behalf of the plaintiff, that the vessel or receptacle in which the lime was slacked was selected by the defendant's foreman, and that a special danger attached to the slacking of lime therein, of which the plaintiff was ignorant, and as to which he was not informed by the defendant. This receptacle, as appears by the evidence, was a metallic cylinder or drum, 18 inches high and 12¾ inches in diameter. These drums had been used for holding chloride of lime in the manufacture of chloroform. When discarded for that use, they lay around the yard, and were, as we have seen, sometimes used for ashes and waste material. That such a receptacle should have suggested itself either to the plaintiff or to the defendant's foreman, was most likely, answering better than what has been described as the usual receptacles for such purpose, barrels and buckets.

It is not denied that the so-called "explosion" was occasioned by the pouring of too little water on the lime at first, and afterwards, when it had become heated and the water absorbed, adding a small quantity of water to the heated material. The gas or steam instantaneously produced by this operation was the cause of the injury, by blowing up the lime into the face of the plaintiff, who was leaning over the drum. The same causes would have produced the same results, if the lime had been slacked in a barrel or a pail. There is nothing in the evidence to show the contrary. The danger of its happening was incident to the employment of slacking the lime in any ordinary receptacle. As such, its risk was assumed by the plaintiff in undertaking the work. There is no evidence to show that such a thing had happened before at these works, though these drums had been used, or that the defendant had any information in regard thereto, not possessed by the plaintiff, nor is there any more reason for saying that defendant ought to have known of the likelihood or danger of such a happening, than that the plaintiff

should know of it. No duty is imposed upon the master, to caution his servant against dangers incident to his work, as to which the master has no better information than his servant, or as to which there is any reason why the master should be better informed than the servant. Indeed, in the case of slacking lime and making whitewash, it is more reasonable to suppose that any man of mature years and fair intelligence, who had been variously employed as a laborer, and who had ever made whitewash, would be better informed as to whatever of danger attended the operation, than his casual employer, whether he be an ordinary housekeeper, farmer or manufacturer.

The expert testimony, describing the chemical action of water upon lime, in scientific terms, and what the precise effect of using too little water at first and adding small quantities afterwards to the superheated lime in such a vessel as a barrel, bucket, or drum, and the danger incident thereto, does not at all affect or qualify our judgment in this respect. Scientific knowledge is not in this respect better than common knowledge, to assist the ordinary man in performing this work, or in avoiding the dangers incident thereto. Nor does it help us in determining in this case, whether ordinary care was exercised by defendant, in permitting the use of the drum for making the whitewash in. To hold the contrary of this, would impose upon the thrifty housewife, who employed a chance laborer to whitewash her garden fence, the duty of giving instructions to one she had every reason to believe was as well or better informed on the subject than herself, and would expose her to a possible liability that would indeed be startling.

We have examined the numerous and familiar cases cited by the defendant in error, dealing with the duty of the master to use ordinary care in providing a safe place in which, and safe appliances with which, a servant is to work, and also his duty to inform his servant of the dangers incident to the special work in which he was employed, and of which the master is informed, or ought to be informed, and of which the servant is ignorant. None of them are applicable to the case at bar. In our opinion, there is no proof of a want of ordinary care on the part of the defendant, in furnishing to the plaintiff a safe place in which to work, or, assuming that the drum was furnished by defendant, for the purpose of making whitewash, safe appliances with which to work. The explosion caused by putting a small quantity of water on the superheated lime, was a danger, whether due to plaintiff's own negligence, or not, incident to his employment, and as to which the defendant had no greater knowledge, or means of knowledge, than had the plaintiff.

The judgment below is therefore reversed.