## Kentucky Utilities Company v. Clayton's Administratrix.

(Decided May 23, 1930.)

GORDON & LAURENT and C. J. WADDILL for appellant.

CHAS. G. FRANKLIN for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing.

Appellee's decedent, Brodie Clayton, died on September 27, 1927, as a result of a heat stroke which he suffered while working for the appellant in its electric plant at Earlington, Ky. Clayton at the time of his death was 25 years of age, and had been continuously in the employ of the appellant at its plant for over a year prior to the date of his death. At the time of his death, he was engaged in cleaning out the tubes of one of the boiler drums of the plant. This boiler drum and the boiler room in which it was located is thus accurately described in the brief of the appellant:

"The boiler room is the only room in the building which is of interest in this case, and it is the front room of the building and extends entirely across the front of the building for a distance of 60 or 70 feet. The record does not show the exact depth and height of the room, but, from the descriptions in the record of the boiler structures, we think it is fair to conclude that the room was from 30 to 35 feet in depth, and from 35 to 40 feet in height. There are three boilers in that room. They are exactly alike and sit parallel with each other, all facing the front of the building. There is a space of about 6

feet on either side of the center boiler, separating it from the boilers on either side.

"It is important to note that the term 'boiler' as used in this record is not the cylindrical metal container of water and steam which is the object that the layman visualizes when that term is used. Such a container of water and steam is called in this record a 'boiler drum.' The term 'boiler' denotes the entire brick structure containing the furnace, grating, tubes and boiler drums.

"Each boiler is a brick structure about 14 feet across the front and about 20 feet deep, and from 25 to 28 feet in height. The brick walls are 16 inches thick, the inside two layers of brick being fire brick, and the remainder red brick. Not only are the sides of brick, but the top is also bricked over so that there is no exposed surface at all, except at the ends of the boiler drums hereinafter described, and those boiler drum ends are insulated with asbestos. . . .

"The coal is fed into the furnace by an automatic stoker through the front of the boiler. The amount of heat inside the boilers will not vary to a considerable extent because when the heat in the boiler creates a certain pressure, that pressure automatically cuts down the supply of coal in the stokers. So that the mere fact that one boiler may be closed down does not mean that there is any more heat in the other boilers than there would be if all three were in operation at the same time.

"Each boiler contains four (4) boiler drums; one lower drum, which extends across the boiler and parallel with the front of the boiler and about half way between the front and the back of the boiler and a few feet above the furnace. The record does not show exactly the height from the floor of the manhole at the end of that drum, but, from the other dimensions, it is fair to say that the end of that drum is probably from 3 to 5 feet from the floor, so that the drum head can be opened by a man standing on the floor in the walkway on the right hand side of the boiler as one would face the front of the boiler. This lower drum is called the mud drum because it collects the impurities through the tubes from the other three (3) boiler drums.

"The other three (3) boiler drums are parallel with the lower drum and are all located 25 or 30 feet

above the floor, one drum running across the front end of the boiler, another drum running across the center of the boiler, and the third drum running across the back of the boiler. There are 110 tubes, each 3¼ inches in diameter, and 22 feet in length, extending from each one of the upper drums into the lower drum, so that there are 330 of those tubes connected with the lower drum.

"There is a manhole at the end of each one of the drums on the right hand side of each boiler as one faces the boiler, and those manholes are flush with the brick setting and are insulated as heretofore stated. The manhole itself is oval-shaped, being about 12 inches high and 16 inches wide. The diameter of the inside of the boiler drum is 40 inches.

"There is a platform of iron grating running along the side of the boiler, an appropriate distance below the manholes to allow men to work on the drums through the manholes or climb through the manholes into the drums. This platform extends along all of the boilers and is reached by an iron ladder attached to the side of one of the walls of the boiler room."

The record discloses that, when a boiler has been used for four or five weeks, it is necessary to clean it because of impurities which have collected in the drums and because of hard scales which form in the tubes. This plant of the appellant furnishes electric current for a large territory surrounding the place of its location and necessarily, in order to keep the production of electric current uninterrupted, two of the boilers must be kept in operation while the third is shut down for the purpose of being cleaned and repaired. When a boiler is shut down for the purpose of being cleaned and repaired, the fire in the furnace is drawn, and, after the water has cooled, it is drained from the boiler drums, and the heads of the manholes are taken out of all four of the drums. After the drums have been thoroughly washed with water under high pressure, each tube is washed separately, and then each tube is cleaned with a tube cleaner in order to remove the hard scales which have formed therein. For the purpose of cleaning these tubes, a device called a "Lagonda tube cleaner" is used. It is thrust into the drum with its end from which its operation is controlled projecting outside, where the operator, standing on the

platform, manages it. It consists of an air hose wrapped with pliable metal. Its nozzle consists of a cleaner attachment about 6 inches long and 3 inches in diameter so that it will fit into the tubes which are $3\frac{1}{4}$ inches in diameter. On the end of the nozzle is an instrument which is called a "high-speed rotor" which has a cast iron head with a rough surface. When the operator has inserted the nozzle or cleaner into the tube, he turns on the air and the high-speed rotor vibrating violently cuts away the scales in the tubes. On the day of Clayton's death, he was working on the middle boiler, which had been shut down for about a month for repairs, and which was being cleaned before being put back into operation. He was working on the center drum of the upper three drums. He was the man who was in charge of the work. The day was very hot for that time of the year; the thermometer registered about 90 degrees on the outside of the plant. It was very hot on the inside of the plant, and of course it was hotter up near the top of the room where Clayton was working than it was on the floor. Leslie Boyd was in charge of the plant and was Clayton's superior. In doing the work Clayton had two helpers, John Tandy and Dennis Brooks. Each of them would operate the tube cleaner for 15 minutes, at the end of which time he would be relieved and would go to a window to get cool. Thus each one of the three worked 15 minutes and rested and cooled 30 minutes.

During one of the periods while Clayton was operating the cleaner, it got "hung up" in the tube, and he was unable to dislodge it. He thereupon called upon his two helpers to come and assist him in loosening it, but they were unsuccessful. They then secured a piece of pipe, and Clayton and Tandy entered the drum and endeavored to dislodge the cleaner, but again without success. They were inside the drum about 15 minutes on this occasion. On coming out of the drum, Clayton went down to the ground floor and informed Boyd about the cleaner being "hung up." Boyd told him to increase the air pressure in the hose in order to create an excessive vibration, and he and Clayton went down into the basement and there increased the air pressure. Clayton then went back up to the drum, but despite the increased air pressure the cleaner still hung fast. In about 30 minutes, Clayton returned to the ground floor and again informed Boyd that he had failed to get the cleaner loose, and he told Boyd that he believed that he could take a pipe and knock

it loose but that it was pretty hot up there. Boyd told him that they had then better rig up a fan. The appellee's witness Jack Seats says that Clayton told Mr. Boyd that it was too hot up there and that he could not stand it, and that Boyd said: "Well, rig up that fan and let it run a few minutes and it will be all right." Boyd denies that he made any statement to the effect that "it would be all right."

At all events, Clayton and Boyd did rig up a fan on the ground floor to force air through the lower drum and the tubes into the upper drums to secure a better circulation of the air and to relieve the temperature conditions. This fan was 16 inches in diameter. There was a heavy canvass tubing attached to the front of the fan at one end and the other end of the tubing was placed in the manhole of the lower drum. The fan itself was set on the floor of the boiler room between the middle boiler and the one next to it and near the back of those two boilers. After the fan had been rigged up, Clayton went back into the drum with Tandy and again stayed there about 15 minutes. They were still unsuccessful in loosening the tube cleaner. They then came out of the drum, and Clayton went down to the ground floor and procured a hammer and some other equipment and then returned to the platform, when he and Tandy went into the drum for the third time. After staying in the drum for about another 15 minutes, Clayton said to Tandy: "Let's go out and get some air." Tandy came out of the drum first. On getting out and looking around he discovered Clayton lying in the drum unconscious. Clayton was taken out of the drum, but never regained consciousness, and died within a short time.

Suit was brought by the appellee, his administratrix, against the appellant, on the theory that it had failed to furnish Clayton a reasonably safe place in which to work. In avoidance of the pleas of contributory negligence and assumption of risk interposed by the appellant in addition to its traverse of the appellee's petition, the latter alleged that the appellant had assured her intestate that the place of labor furnished him was reasonably safe, and that, relying on such assurance and not appreciating the danger to himself of continuing to labor therein, and the danger not being known to him and not being so obvious that a person of ordinary intelligence and prudence would have refused to work, her intestate continued to labor at the place in question until he met his death. The trial

resulted in a verdict for the appellee in the sum of $30,-000, and, from the judgment entered on that verdict, the appellant has prosecuted this appeal.

Many grounds are urged for reversal, but we need not discuss or decide any of them save the one whether appellant was entitled to a peremptory instruction or not. Appellant insists that it was on the theory that, in entering the boiler drum on the occasion when he suffered the heat stroke, Clayton assumed the risk of any ill effect of the heat. Appellee insists that appellant was not entitled to such an instruction, since there was evidence to establish that Clayton did not assume the risk mentioned because of the assurance of safety given him by Boyd, his superior. The proof establishes without contradiction that Clayton knew about the heat conditions in this boiler drum. He had worked in this plant for over a year prior to the date of his death, doing the same character of work he was engaged in on the fatal day. It does not appear that Clayton had ever been in a boiler drum before the day upon which he died, but he certainly knew about how hot it was in the plant, and, being the intelligent man which the record shows him to have been, he must have known it was hotter inside the boiler drum than it was outside of it. He had been in the boiler drum and stayed in it for about 15 minutes before he ever reported to Boyd, and, on telling Boyd how hot it was in the drum, received from the latter the alleged assurance of safety upon which appellee relies. Of course, appellant denies any such assurance was given to Clayton, but, in testing the propriety of a peremptory instruction, it must be remembered that the jury had the right to believe that such an assurance was given, and, if so, the question is, would a peremptory instruction have been proper under such circumstances? Possessing this knowledge of the heat conditions, did Clayton have the right to rely upon the assurance given him by Boyd that it would be all right in the drum after the fan had been rigged up? Boyd's assurance carried the two ideas of a reduction of temperature in the boiler drum due to the operation of the fan and of the effect of the temperature as so reduced upon the constitution of Clayton. We are not called upon to decide what effect this assurance with its double intendment would have had upon the rights of the parties had Clayton suffered a heat stroke upon entering the boiler drum immediately after he had received the assurance, for that is not the state of case

here presented. He did not suffer a heat stroke until after he had entered the boiler drum, worked there for about fifteen minutes, came out, procured some tools, and entered it for a second time after the assurance of safety had been given him. It is thus clear that he had ascertained for himself when he entered the drum for the first time after Boyd had told him that "it would be all right" the extent of the reduction of temperature due to the operation of the fan, and that he knew when he entered the drum the next time, after having gone for the tools, how hot it was in that place. Hence, when he entered the boiler drum the last time, Boyd's assurance was reduced down simply to an assurance that such heat as was in the boiler drum would not affect Clayton's constitution. Under such circumstances, it is settled in this jurisdiction that Clayton, on entering the drum the third time, assumed the risk of the effect of heat upon his constitution.

In the case of Louisville & Nashville Railroad Co. v. Sawyers, 169 Ky. 671, 184 S. W. 1123, 1124, the rule was thus expressed: "The only safe and practical rule is that each man is the best judge of his own physical strength and powers of endurance; that he knows better than any other can when the limit has been reached, and when in following his own instinct of self-preservation, he must desist and exercise his right under the law to give up his work if it is more than he can stand."

In that case the appellee was denied a recovery for physical injuries occasioned by his having become overheated at his work, which was drying sand for use in the sand boxes in locomotives. It did not appear in that case that any assurance of safety had been given the employee by the employer, although the court did say that the result would have been the same had there been such an assurance. The principle upon which the case was rested justified of course the court in that statement.

The reason for the rule is thus stated in Louisville & N. R. Co. v. Williams, 165 Ky. 386, 176 S. W. 1186, 1188, L. R. A. 1915E, 613:

"The master is under no duty to prevent his servant from becoming overheated at his work resulting from atmospheric or weather conditions, as they are matters entirely beyond his control. In such case, while the servant may not always certainly know how to keep himself within the limits of

safety, he is better able to judge than any one else how much heat he can safely stand, how it affects him, and when his endurance reaches a point beyond which he ought not for his own safety to continue at work. For these reasons it is for him, and not the master, to determine whether he shall engage in the work at all; or, if so, how energetically, and when he should rest or quit. If this were not true, an employer could never afford to employ a laborer to do work at which there was any probability of his becoming overheated; and it is not to be overlooked that in operating furnaces, engines, and other heat-producing machinery or appliances, there is always more or less danger to the operatives of becoming overheated, and the same is likewise true of farming and other occupations which compel the laborer to be exposed to the heat of the sun.''

Appellee undertakes to distinguish these cases on the theory that the ''heat'' there involved was heat occasioned by ordinary atmospheric conditions, whereas the heat here involved was brought about by the operation of the other two boilers. The distinction is not meritorious, however, since the principle is not rested upon how the heat is engendered but upon the servant's presumed better knowledge as to the ability of his constitution to stand any certain degree of temperature whether the heat which occasions it is natural or artificial.

In the analogous line of cases involving overexertion, we find the rule thus stated in Central Kentucky Gas Co. v. Cantrell, 183 Ky. 291, 209 S. W. 1, 2:

''The master is sometimes held liable for injury to the servant, when the master assures the servant that the place of work is safe, or that the tools or implements are in good condition, and this liability is rested upon the master's superior knowledge of the facts and conditions; but the master does not know, and has no means of knowing, the physical strength or endurance of a servant, except as he sees the servant exert it, yet the servant knows precisely his strength, and when it is safe for him to undertake to do a certain work which requires exertion, and in such case the master is not made liable because of the assurance of safety for the reason that the master does not possess superior knowledge,

but that knowledge is in the possession of the servant.''

The cases upon which appellee relies, illustrated by those of Louisville Gelatine Works v. Minton, 144 Ky. 834, 139 S. W. 1087, and Rogers v. South Covington & C. St. Ry. Co., 112 S. W. 630, 33 Ky. Law Rep. 1067, are not applicable to the state of case here presented. The Minton case is representative of that line of cases where the employee is relieved from the defense of assumption of risk because of the assurance of his employer that the manner of work is safe and it is not so obviously unsafe that a person of ordinary prudence would not rely upon such an assurance. The Rogers case is representative of that line of cases where the assurance is as to the safety of the tool with which or the place where the work is done. In each line of cases, the servant is assured as to the safety of something external to himself and upon the superior knowledge as to which on the part of his employer he is entitled to rely. But, in the instant case, the assurance is as to the effect of heat conditions which are as well known by the servant as by the employer upon the constitution of the servant. In such state of case, the rule is that the servant is not entitled to rely upon any assurance of his master, but must rely upon his own knowledge of his own powers of endurance.

Such being the rule it follows that Clayton, on entering the boiler drum for the third time, assumed the risk of the effect of the heat upon his bodily health, and that the appellant is not responsible for the heat stroke he then suffered. The trial court should have peremptorily instructed the jury to find for the appellant.

Its judgment is therefore reversed, with instructions to grant the appellant a new trial in conformity with this opinion.

Whole court sitting.