## GRAMMER v. MID-CONTINENT PETRO-LEUM CORPORATION.
### No. 905.

Circuit Court of Appeals, Tenth Circuit.
May 1, 1934.

BRATTON, Circuit Judge, dissenting.

Roscoe E. Harper and R. D. Hudson, both of Tulsa, Okl. (Gentry Lee, Harper & Lee and Hudson & Hudson, all of Tulsa, Okl., on the brief), for appellant.

I. L. Lockewitz, of Tulsa, Okl. (J. C. Denton, R. H. Wills, J. H. Crocker, and J. P.

Greve, all of Tulsa, Okl., on the brief), for appellee.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

McDERMOTT, Circuit Judge.

On January 2, 1920, W. J. Grammer went to work for appellee as a tank cleaner, in which work he became acquainted in a general way, with the work of cleaning high pressure stills. On April 4, 1921, he was promoted to still cleaner at his own request, a job with shorter hours and better pay. He worked steadily in that capacity until February 27, 1932. During that eleven years he was off a week with a cold, a month with stomach trouble, and a few days with an abscessed tooth. He became ill with some form of lung trouble and died July 7, 1932. His doctor diagnosed his condition as pneumoconiosis, a disease characterized by the formation of a deposit in the lungs, the growth of fibrous tissue, and caused by the inhalation of foreign matter. His doctor testified that by a process of elimination, he deduced that the death resulted from the work of cleaning stills for so many years. The doctor said:

"I found nothing in his history to explain his condition outside of the conditions under which he was employed by the Mid-Continent Petroleum Corporation."

This action was brought by his administratrix for his wrongful death, on the conventional grounds that appellee failed to provide Grammer with a reasonably safe place in which to work, reasonably safe appliances with which to work, failure to warn, to instruct, to establish rules, and to inspect. The trial court directed a verdict at the close of plaintiff's case and the principal error assigned is leveled at that ruling.

The case was tried below and presented here in a very different way from the ordinary personal injury case. Appellant's counsel tried the case on the novel but commendable theory that the jury should have all the facts, and that it made no difference in the end who called the witnesses. Working conditions were thoroughly explored from witnesses friendly and unfriendly. The cause has been briefed and argued here on two occasions, each time with vigor but fairness on both sides. Upon conference, following the first argument and a study of the record and briefs, three different ideas were held and stoutly maintained by the sitting Judges. The cause was reargued, and many points clarified by that reargument. The fairness of counsel enables us to pass lightly over many points without extended discussion, and get to the narrow but troublesome question upon which the cause must turn.

In refining crude oil, the crude is first run through "crude" stills, the residuum from which is gas oil. The gas oil is further refined in the high-pressure stills here involved. These stills are from 8 to 10 feet in diameter and 30 to 40 feet in length, with three manholes of from 24 to 30 inches in diameter, one on the front and two on the top. The stills are designed to operate on a cycle of 48 hours, that is, it should take 48 hours to complete a run. If not completed in that time, a still must lay over until the next cycle starts. This sometimes happened, but was avoided where possible.

The cycle starts when gas oil is placed in the still and the fires are lighted. The stills operate under a temperature of 690–740° F. and a pressure of 80 pounds. The fires are cut when a required percentage of distillation has been reached. The still operates under its accumulated heat and pressure for an hour or so. The contents of the still are pumped out, a task taking from 30 to 45 minutes. Live steam under pressure is then forced through the still for an hour to an hour and a half, to clean the still as dry as possible. The manhole plates are then removed, and the still is steamed with a blower ventilator that displaces, or is supposed to, all the air and gases in the still in from 1 to 3 minutes; this forced ventilation is maintained as long as the still foreman thinks necessary, but generally from an hour to an hour and a half. Then air is forced through the stills until they are cooled to the point where the still cleaners can enter, the cleaners themselves, or a straw boss among them, determining when that point is reached. Atmospheric conditions play their part in this, but in normal course, the blowers go on at five o'clock and the cleaners' tour of duty starts at seven o'clock. For a time, water was used in cooling the stills, but that was stopped because of the hazard to workers which came about by the crystallization of hot metal when too suddenly cooled.

The fires were generally cut at ten o'clock at night, which allowed nine hours for the described operations before the cleaners came to work. The rule was that twelve o'clock was the dead line for cutting the fires, and if a still was carried beyond that time, the still was not cleaned but carried over to another cycle. There is evidence that this rule was often disregarded, and stills coming off at three or four o'clock in the morning were often cleaned.

These were standard practices for distillation of sweet or low-sulphur content crudes, such as were refined by appellee. They are the "Safe Practices in Cleaning Petroleum Stills" approved by the National Safety Council, and in use for many years at appellee's large refineries until the process was displanted in 1931 or 1932. Until the present suit was filed, no occupational disease had been known to result.

The still cleaners came on duty at seven A. M., and were paid for eight hours, but their day was over when the stills were cleaned, generally by ten-thirty or eleven o'clock. There were 100 stills to be cleaned, and five gangs of eight men each to clean them. A still could be cleaned in 20 to 30 minutes. A slight computation sheds considerable light on the point, much argued, about occasionally cleaning a still that came off late—not unplated until seven o'clock as one man testified. It is argued that this was done, in violation of the rules, to prevent the economic loss of laying the still over. Let us see if there is another reason. If the fires were cut at four A. M., the latest hour mentioned, the cooling process would be complete in 7 hours and 15 minutes, taking the maximum time mentioned for each step. It would be ready, then, at 11:15 for the cleaners. The latest hour for unplating mentioned in the evidence is 7 o'clock. It takes four hours, at the maximum times mentioned, to cool after unplating, or 11 o'clock. The cleaners were paid to work until 3 o'clock in the afternoon if necessary. They could have cleaned the stills that came off late between 11:15 and 3 o'clock. But if they cleaned them before they were cool enough, they could go home. There is evidence that the gang foreman's task was to keep them out of stills that were too hot; and if stills were occasionally entered that were too hot, it was done so the cleaners could finish and get away. The stills were not entered until the boss of the gang put his head in the manhole to test the heat and sniff for gas.

The work of the cleaners was to rake down coke, burning or smoldering, that escaped the mechanical rake, and clung to the top or sides of the still, and sweep it out. The breaking up of these coke deposits gave off dust and a trace of gases. The cleaners were clothed in heavy woolen suits, wooden shoes, and were furnished with a respirator. The respirator had a fine wire mesh, designed to catch all but the finest dust, a sponge which the workmen were instructed to keep wet, and an exhaust valve.

■ 1. *Cause of Death.* Among other reasons for directing a verdict, the trial court was of the opinion that there was no substantial proof that death resulted from this work. The proof is most unsatisfactory. Conceding that death resulted from pneumoconiosis, the doctor's opinion that it came from his work was formed, as he says, because he could find no other reason for it. However, pneumoconiosis concededly results from deposits of foreign material, and Grammer did work in a dust-laden atmosphere. That the doctors never knew of another still worker being so affected, and that the medical books tell of no other, goes to the weight of the evidence. Since this case was filed, many other still cleaners find themselves similarly afflicted and have testified in this case. The answers to the hypothetical questions are in stereotyped form. We think it sufficient to go to the jury. Whether a trial court would be justified in setting aside a verdict on this ground, is not before us. Prinsen v. Travelers' Protective Ass'n (C. C. A. 10) 65 F. (2d) 841, reversed on other grounds, 291 U. S. 576, 54 S. Ct. 502, 78 L. Ed. 999.

■ 2. *The Duty of an Employer.* An employer is not an insurer; his duty to furnish safe working conditions is not an absolute one, although it is nondelegable; his duty is to use reasonable care to that end. Ordinarily, fulfillment of that duty is established when it appears that the employer conformed to the common usages of the industry, for one cannot ordinarily be said to be negligent if he does that which ordinary men, like situated, do. He is not bound to discard standard appliances whenever a better one is put on the market. Baltimore & O. S. W. R. Co. v. Carroll, 280 U. S. 491, 50 S. Ct. 182, 74 L. Ed. 566; Yazoo & M. V. R. R. Co. v. Mullins, 249 U. S. 531, 39 S. Ct. 368, 63 L. Ed. 754; Chicago & Northwestern Ry. v. Bower, 241 U. S. 470, 473, 36 S. Ct. 624, 60 L. Ed. 1107; Seaboard Air Line v. Horton, 233 U. S. 492, 501, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; Patton v. Texas & Pacific Railway Co., 179 U. S. 658, 664, 21 S. Ct. 275, 45 L. Ed. 361; Washington, etc., Railroad Co. v. McDade, 135 U. S. 554, 10 S. Ct. 1044, 34 L. Ed. 235; Kyner v. Portland Gold Mining Co. (C. C. A. 8) 184 F. 43; Haines v. Spencer (C. C. A. 3) 167 F. 266. Judge Walter H. Sanborn, in H. D. Williams Cooperage Co. v. Headrick (C. C. A. 8) 159 F. 680, 682, stated the rule which has been applied in the states of this circuit for many years:

"The master is not required to furnish the best, the safest, or the newest appliances or methods of operation, nor to adopt extraordi-

nary or unusual safeguards against risks and dangers. The limit of his duty here is to exercise ordinary care to supply reasonably safe places, appliances, and methods. The test of his discharge of this duty is the exercise of ordinary care to supply such places, appliances, and methods as persons of ordinary intelligence and prudence commonly furnish in like circumstances."

There are cases where accepted industrial usage does not meet the standard of reasonable care. Texas & Pacific Ry. Co. v. Behymer, 189 U. S. 468, 23 S. Ct. 622, 47 L. Ed. 905; The T. J. Hooper (C. C. A. 2) 60 F. (2d) 737; Elkton Auto Sales Corp. v. State of Maryland (C. C. A. 4) 53 F.(2d) 8; James Baird Co. v. Boyd (C. C. A. 4) 41 F. (2d) 578. The test is reasonable care, not customary usage. The appellee met this test, for there is no evidence of better equipment or safer practices. Appellee conformed to the standards of the industry.

Appellant invokes another rule of law, supported by respectable authority, that where employees work with known poisons or in the presence of inherently dangerous instrumentalities, the employer must search for lurking dangers, and is held to know whatever science might discover. In Green v. Standard Wholesale Phosphate & Acid Works (D. C. Md.) 29 F.(2d) 746, 748, this rule is stated:

"Proof of actual knowledge is not required where the article is so made up as to be inherently harmful, and he cannot excuse himself upon the ground that he did not know its dangerous qualities."

To the same effect see, Thompson v. United Laboratories Co., 221 Mass. 276, 108 N. E. 1042; Adams v. Grand Rapids Refrigerator Co., 160 Mich. 590, 125 N. W. 724, 27 L. R. A. (N. S.) 953, 136 Am. St. Rep. 454, 19 Ann. Cas. 1152; Chicago, R. I. & P. Ry. Co. v. Cheek, 105 Okl. 91, 231 P. 1078; Wagner v. H. W. Jayne Chemical Co., 147 Pa. 475, 23 A. 772, 30 Am. St. Rep. 745; Fritz v. Elk Tanning Co., 258 Pa. 180, 101 A. 958; Kane v. Federal Match Corp. (D. C. Pa.) 5 F. Supp. 507.[1]

The principal question in the case, therefore, is this: Was appellee dealing with substances inherently dangerous within the doctrine of these cases? To bring this case within that doctrine, it is not enough that it was known that traces of noxious gases were present. Many poisons are comparatively harmless when the dosage is diluted. Nicotine, concentrated, is a deadly poison. But an employee, permitted to work where men smoke, could not invoke the doctrine of inherently dangerous substances. The question here is; Did appellee have any reason to suspect the presence of these gases in dangerous quantities?

3. *Knowledge of Appellee.* It is not contended that appellee in fact knew that pneumoconiosis or any other occupational disease would follow from its practices. In fact, no one knew it, for the doctor explored medical books in vain to find another such his-

---

[1] Finding, as we do, that there is nothing inherently dangerous in carbon dust or traces of petroleum vapor, we assume, for the purpose of this opinion, the correctness of this rule. There is much authority to the contrary. In Stevens & Sons Co. v. Daigneault (C. C. A. 1) 4 F.(2d) 53, an employee was working with an emulsion of petroleum oil and alkali which was poisonous to those who had an idiosyncrasy for it. The employer did not know this, and he was held not liable. In Canfield v. Iowa Dairy Separator Co., 172 Iowa, 164, 154 N. W. 434, and Kitteringham v. Sioux City Ry. Co., 62 Iowa, 285, 17 N. W. 585, the employee was working with a diluted solution of muriatic acid which the employer did not know to be harmful, no employee having been theretofore injured by it. It was held that the employer was not liable since he had no knowledge or reasonable grounds to believe that the solution was harmful. In Corcoran v. Wanamaker, 185 Pa. 496, 39 A. 1108, a laundry worker was injured by acids used in her work, and it was held that since the em-

ployer had no knowledge that the acids, in dilute quantities, might produce disease, there could be no recovery. In Roessler & Hasslacher Chem. Co. v. Peterson (C. C. A. 3) 134 F. 789, an employee was injured by an explosion caused by using too little water in slaking lime. The employer did not know that such result might follow, and was held not to be liable. Bollington v. L. & N. R. R. Co., 125 Ky. 186, 100 S. W. 850, 8 L. R. A. (N. S.) 1045, is another case dealing with the slaking of lime which reached the same result. In Pinkley v. C. & E. I. Ry. Co., 246 Ill. 370, 92 N. E. 896, 35 L. R. A. (N. S.) 679, an employee working with creosote became afflicted with eczema; the employer did not know that such a disease might follow the use of creosote, and was held not liable. In Kentucky Utilities Co. v. Clayton's Adm'r, 234 Ky. 454, 28 S.W.(2d) 497, an employee was not permitted to recover for a heat stroke suffered in a boiler drum, even though he went in under an assurance of safety.

tory. That the still cleaners worked steadily for years without illness[2] strongly evidences that appellee had no knowledge nor reason to suspect that occupational disease might follow long years of service. The Vice-President in charge of refining operations for appellee testified, without contradiction, that in 26 years refining experience, he had never heard of another such case. Appellant contends that since pneumoconiosis was a disease long known to the profession, appellee could have discovered this peril, then unknown to the industry or the medical profession, by employing chemists to ascertain qualitatively and quantitatively, the constituents of the dust and gases in the stills, and then by researches in the medical profession, could have discovered that if the employment continued for a certain length of time, disease might follow. Whether appellee is held to that unusual standard of care can be determined by an inquiry, presently to be made, of its knowledge of carbon monoxide and hydrogen sulphide.

4. *Appliances.* The workmen were equipped with respirators heretofore described, instructed to wear them and keep the sponges wet, and water was provided outside each still for that purpose. The wire mesh would clog up, and the workmen would, at times, throw them away rather than take a moment to clean them. Sometimes workmen replaced the sponges and the rubber head-tape furnished with better ones. New respirators were available when the old ones were worn. There is no proof nor suggestion that better respirators, as distinguishable from gas masks, were on the market, or that there was any absence of care in this regard.

5. *Heat.*[3] The work was carried on under most trying conditions. The temperatures in the stills ran from 150° to 250° F. The heat often produced nausea. But all the witnesses agree, including those who have pending suits, that no cleaner was ever sent into a still when he thought it was too hot, although it was necessary at times to forbid a gang to enter when they wished to hurry through. A cleaner came out as often, and stayed out as long, as he wished. The risk of the heat was assumed in law and in fact, for Grammer knew the conditions when he applied for the job. There were a few complaints of injuries to health generally on account of the nature of the work, and men were told if they did not want to work under such trying conditions, they might quit. But no one did more than generally complain; there was no suggestion of any lung disease, and the length of time men so employed held their jobs would have belied any such suggestion.

Furthermore the heat was not a contributing factor to the thickening of the fibers of the lung. Exposure to heat may well have lowered Grammer's resistance to disease, just as all hard work takes its toll. The surgeon at the operating table and the nurse at his side, the captain on the bridge of a liner and the stoker in the hold, the lawyer at the trial table and the judge on the bench, all give something of themselves to their tasks. But the lowering of resistance that comes with all hard work, is not actionable.

6. *Dust.* If Grammer died of pneumoconiosis, and if his occupation had anything to do with it, it was because of the dust in which he worked. He knew the dust was present when he took the job and when he kept it year after year. He knew it was somewhat harmful to the lungs, for he was furnished with a respirator and told to wear it, and that its purpose was to keep the dust out of his mouth, nose, and lungs. The dust irritated the throat and coughing followed. He assumed the ordinary, known risks attendant upon inhaling dust-laden air. Butler v. Frazee, 211 U. S. 459, 29 S. Ct. 136, 53 L. Ed. 281. No more effective warning of danger could be given than by furnishing respirators and requiring them to be worn.

Grammer did not however assume the risk of any concealed dangers lurking in the dust. Appellee concededly knew of no lurking danger. Should it have discovered the danger? There's the nub of this case. If coke dust, or the gases hereafter discussed, alone or in combination, are inherently dangerous substances, as is arsenic or nitric acid, the cases above cited are to the effect that appellee should have exhausted scientific knowledge in an endeavor to run the danger to its lair and protect against it. But is carbon dust an inherently dangerous substance? Appellant's own scientist said it was less harmful than ordinary house dust. The record discloses what we all know, that men live and die amid the dust and soot of the industrial districts of the cities of Pennsylvania and Ohio; and that coal miners and stone-workers per-

---

[2] Grammer worked 11 years, another witness 11½ years, another 13 years, and another 14 years, without any lung trouble showing up.

[3] Heat is not specifically pleaded as a ground of negligence.

form their tasks in clouds of dust. Certainly ordinary house dust cannot, in law or fact, be classed with poisons or explosives which must be handled with infinite care.

7. *Gases.* Appellant's contention is bottomed on the presence of two gases in the stills, carbon monoxide, and hydrogen sulphide.

Carbon monoxide is a by-product of combustion, and exists wherever there is a fire. In minute quantities, as in a living room with a fireplace or a kitchen with a stove, it is comparatively harmless. In large quantities, it deprives the hemoglobin of the blood of its affinity for oxygen, and death is immediate and painless. Medical authorities, relied upon by appellant, say that it has no irritating effect on the lungs, and that there is a dispute among the authorities as to whether long exposure to minute quantities produces any chronic result. We need not be scientists to know that the quantities found in the ordinary home have no substantial deleterious effect. There is not a word in this record as to the quantity of such gas left in these open stills after the hours of forced ventilation; there is no suggestion of any acute attack of poisoning during the many years covered by the testimony. As far as this record goes, there was no more present than in the ordinary home.

Hydrogen sulphide results from the breakdown of sulphur. Appellant's scientist testified that hydrogen sulphide is dangerous or toxic at from 100 to 150 parts in a million, but continued exposure to one-third of that amount would be harmful. Its deleterious action, like carbon monoxide, is very rapid and usually leaves no permanent effect on those who survive. Where death is not instantaneous, the symptoms are irritation of the eyes, catarrh of the nose and throat, palpitation of the heart, headache and cold sweats. Bronchitis and pains in the chest are frequent with a destruction of the lining of the lungs.

There is evidence that there was a trace of hydrogen sulphide in the stills; the men sometimes smelled it, and fillings in their teeth tasted like copper. But there is not a scintilla of evidence that the amount of hydrogen sulphide left in the stills after the forced ventilation even approached the danger mark. All the evidence there is, is to the contrary. In the first place, there is not an instance, in these years, of any acute poisoning from hydrogen sulphide, or even of the symptoms that come with an exposure to it. The chemist testified that he himself had been exposed to petroleum vapors for years and years without serious effect. The safety engineer, employed by appellee, inspected these stills for safety throughout the years. During the early years, he inspected them four or five times a week. He made some tests with the Burrell gas indicating machine. Such inspection disclosed no dangerous conditions. The chemist of appellee testified that he did not see how any hydrogen sulphide could be in the stills when the cleaning commenced.

There is another evidentiary fact, adduced by appellant, that powerfully negatives the existence of these gases in any dangerous quantities. The United States Government, through its Bureau of Mines, made an elaborate study of the effects of hydrogen sulphide, the only toxic gas found in the refining process. That report of 100 pages is Bulletin 231 of the Department of Interior, published in 1925. The conclusion is that in the refining of high-sulphur crudes, such as is found in Mexico, danger existed which required gas masks and other protective measures; but that in refining sweet crudes of low-sulphur content, such as we have here, such measures were not required. In part, the Bulletin states:

"Petroleum gases and vapors have not, however, been considered as actively poisonous, in the sense that hydrocyanic (prussic) acid and phosgene are poisonous; men have been exposed to them repeatedly, and for long periods, without any marked ill effects."

"In the Mid-Continent fields occasional crudes contain sulphur, but in general the output of high-sulphur crude is small and unimportant; the two main exceptions are the Healdton field in Oklahoma and the El Dorado field in Arkansas."

Confining its attention, therefore, to high-sulphur crude refineries, the government found no hydrogen sulphide even in them in the stills after forced ventilation for two hours. The report says:

"Hydrogen sulphide was shown to be absent from the coke stills during ventilation and cooling. Conjunctivitis (inflammation of the eyes) in still cleaners may be caused by high temperatures or by sweat getting into the eyes."

There is more of the same tenor; a reading of the entire document leaves no doubt that these investigators discovered no toxicity in the gases arising from the refining of sweet crude, and that the special precautions required in Mexico were not required in the Mid-Continent field.

The argument made by appellant that since refining of Mexican crudes resulted in a toxic quantity of hydrogen sulphide, refining of sweet crudes has the same result in lesser degree, is a non sequitur. Carbon monoxide in a closed garage is a deadly poison; carbon monoxide from an open fire in a living room is harmless. A drop of nicotine will kill a cat, but men smoke all their lives.

Appellant then argues that several things, each harmless by itself, may form a harmful combination. This is true, but it does not follow that all such combinations are harmful. There are two answers to this argument. The proof that hydrogen sulphide had anything to do with the deposit of dust on the fibers of the lungs, is that "gases played a part in that development" and "the gas along with this fine dust would act as an additional irritant. It aggravates the condition and makes it work faster." But on cross-examination, one expert said, "Hydrogen sulphide may or may not be injurious to tissue," and another,

"Carbon dust would play a part in breaking down the lung tissues and causing pneumoconiosis. There is a great deal of difference of opinion about that, and contra-views can be quoted from good authorities about the effect of carbon dust. I believe I can get an authority. I cannot just quote an authority on it, but I believe I can find such a statement."

But the textbooks on the subject, offered by appellant, are much more convincing than the contradictory statements of experts employed for the trial. The textbooks say that it is an open question whether carbon monoxide produces any chronic effects, and that "the literature does not yield much positive data" as to chronic effects from hydrogen sulphide. On top of that, those authorities who believe there is a sub-acute reaction to these gases, do not mention a deposit on the lungs, or an aggravation thereof, as one of the after-effects. There is no proof that in these years of operations, any employee developed any symptom which the authorities ascribe to a sub-acute attack of such poisoning.

Grammer's trouble was not a disease of the eyes or edema; it was a deposit on the lungs. Any finding by a jury that hydrogen sulphide or carbon monoxide had anything to do with this deposit on the lungs would rest on speculation. Mr. Justice Stone, in Atchison, T. & S. F. Ry. Co. v. Toops, 281 U. S. 351, 354, 50 S. Ct. 281, 282, 74 L. Ed. 896, said:

"But proof of negligence alone does not entitle the plaintiff to recover under the Federal Employers' Liability Act. The negligence complained of must be the cause of the injury. The jury may not be permitted to speculate as to its cause, and the case must be withdrawn from its consideration, unless there is evidence from which the inference may reasonably be drawn that the injury suffered was caused by the negligent act of the employer."

Judge Kenyon, in Blair v. United States (C. C. A. 8) 47 F.(2d) 109, 111, said that "For a court to find under this evidence that * * * appellant was totally and permanently disabled would be a mere guess, unsupported by any substantial evidence."

This court has steadfastly adhered to this rule. United States v. Derrick (C. C. A. 10) 70 F.(2d) 162; Nicolay v. United States (C. C. A. 10) 51 F.(2d) 170; Order of United Commercial Travelers v. Greer (C. C. A. 10) 43 F.(2d) 499.

But even if appellant crosses this bridge, another one is just beyond. To bring herself within the rule of inherently dangerous substances, upon which her case is bottomed, there must be proof not only that the combination of harmless substances was harmful, but that appellee should have known the combination was fraught with danger. There is no such proof. Appellee knew that carbon monoxide and hydrogen sulphide, in concentrated form, were deadly, just as nicotine is a deadly poison. In minute quantities, the carbon monoxide from a wood fire is no more harmful than smoke from a cigar; and a minute amount of hydrogen sulphide, although offensive to the olfactory nerve, is not rated as a deadly poison.

The Third Circuit Court of Appeals reached this conclusion in a case very similar on its facts. Pennsylvania Pulverizing Co. v. Butler, 61 F.(2d) 311. In that case an employee contracted the occupational disease of silicosis, arising from the breathing in of small dust particles of silica, and sued his employer. The trial court submitted the case to the jury. The Court of Appeals reversed. The court held that the furnishing of a respirator was adequate warning that there was some danger of injury to the lungs from working in the dust-laden atmosphere, and that since both master and servant knew that some danger existed, the employee assumed the risk of any result which followed, including the occupational, slow developing disease of silicosis.

Appellant's case will not stand the test of dissection. Neither does it stand the test

of a survey from a distance. Appellee was engaged in the refining of oil, a business attendant with some danger as are nearly all constructive undertakings. Its equipment was standard and not defective. It followed the practices approved expressly by the National Safety Council and impliedly by the Bureau of Mines. It employed a safety director, a chemist, and a doctor. It did all that was then known to minimize the risk to its employees. It operated year after year with no occupational disease resulting from the work. It had no reason to suspect any such.

Occupational diseases are a part of the hazards of industry. The loss therefrom, like the loss from accidental injury, ought to be borne by the industry in the first instance, and not by the employee. But it is the function of the legislative arm, and not the judicial, to extend the workmen's compensation laws to cover them. Tested by the principle of fault which underlies recovery for injuries at common law, we do not believe the appellant has established her case.

8. *Other Error Assigned.* The court excluded a pamphlet published by the National Safety Council. Those parts having to do with the present case were admissible, but the whole was offered, and the extraneous parts might have been misused by the jury. We have given appellant the benefit of the material portions thereof in passing upon the sufficiency of her case.

The judgment is affirmed.

BRATTON, Circuit Judge (dissenting).

It is the duty of a master to exercise ordinary care to provide a servant a reasonably safe place in which to work, and the exercise of like care is required to provide reasonably safe appliances with which to perform the work. An employee has the right to assume that his employer has performed his duty with respect to such matters and he does not assume the risk occasioned by a defect attributable to the employer's negligence in failing to do so until he becomes aware of such defect or unless the resulting hazard is so obvious that an ordinarily careful person in the situation would observe and appreciate the peril, in which circumstances he is presumed in law to know of its existence. He is charged with knowledge of an obvious danger.

The duty is enjoined upon the employer to warn the employee of a hazard caused by performance of duty under conditions reasonably calculated to endanger health or life if the danger is unknown to the employee, but is known or through the exercise of ordinary care could be known to the employer. The employer is charged with knowledge of a lurking danger of that character; he must know facts developed through science—medical, chemical, or otherwise—regarding a latent hazard inhering in the work.

Although the question is not free from difficulty, I think the evidence was sufficient to take the case to the jury on the question of negligence in failing to warn the employee of a latent hazard connected with the employment. Several fellow servants testified that he worked under terrific heat—from 200 to 250 degrees Fahrenheit—and that gases and fumes were almost invariably noticed in the stills when they were being cleaned. Some said they smelled like sulphur, some like rotten eggs and some like snakes. After cleaners came out of the stills the fillings in their teeth tasted like copper. In addition to that testimony—substantial in quantity and uncontradicted in character—concerning the physical conditions at the stills, Dr. De Barr, a chemist and toxicologist of wide experience, familiar with the chemistry of petroleum, dangerous gases such as hydrogen sulphide, hydrocarbon vapors and carbon monoxide, also with the effect of poisonous vapors on the human system, testified that sulphur in the form of hydrogen sulphide, organic sulphur and sometimes free sulphur is present in crude petroleum and in the several stages of its refining process; that carbon monoxide, hydrogen sulphide and petroleum vapors are present in stills of the kind in question; that breathing such fumes and vapors produces detrimental effect to the human body; that hydrogen sulphide is dangerous; that it is toxic from one hundred to one hundred and fifty parts per million, that is to say, about fifteen ten-thousandths to ten ten-thousandths per cent.; that dangerous concentrates of hydrogen sulphide act similarly to chloroform with respect to deadening the sense of smell; that one would not be warned of its presence except for a second or two; that hydrocarbon vapors are known to be injurious; that the presence of two or more toxic influences may produce a combined effect greater than their separate effects; that if cleaners observed that fillings in their teeth tasted like metal, that fact would indicate the presence of alkali sulphide or hydrogen sulphide, mostly the latter, in the stills; that there is nothing new about the presence of such gases in stills of the kind in question, that they have been known for years and that a chemist of average ability should have

known since 1920 of the presence of such gases; that long continued breathing of a combination of hydrogen sulphide and coke dust is injurious to lung tissues and that he had authority for that statement, obviously meaning opinions by scientists. It may be added here that many chemical analyses made by defendant showed the presence of sulphur in its crude oil being processed.

Dr. Shepard, a graduate of the University of Tennessee with twenty years' experience in the practice of medicine and a specialist in disorders of the lungs, testified that Grammer was his patient from March 2, 1932, to April 28, 1932, during which period he examined him several times; that he made a diagnosis of pneumoconiosis. Predicated upon the assumption that Grammer worked in stills for several years and breathed air containing hydrogen sulphide and carbon, it was his opinion that breathing such air destroyed the lung tissues and produced Grammer's condition; that the air thus breathed being hot increased its harmful effect; that pneumoconiosis is not a new disease; that it has been known for a long time; that a competent physician with the knowledge possessed by medical science and knowing the conditions under which Grammer performed his duties should have anticipated since 1921 some abnormal condition of the lungs.

Dr. Summers, a licensed and practicing physician in Tulsa, examined Grammer. He likewise made a diagnosis of pneumoconiosis. He testified that the disease has been known for a long time; that a competent physician with knowledge of the conditions under which Grammer performed his duties and predicated upon the knowledge possessed by medical science should have been able to foretell that such disability and death would result; in other words, that a competent physician knowing the conditions attending Grammer's work should reasonably have expected that result. He said, among other things:

"Carbon dust would play a part in breaking down the lung tissues and causing pneumoconiosis. There is a great deal of difference of opinion about that, and contra-views can be quoted from good authorities about the effect of carbon dust. I believe I can get an authority. I cannot just quote an authority on it, but I believe I can find such a statement. I doubt whether any man ever inhaled any large amount of carbon dust without having some silica."

Dr. Hurley, a graduate from the Medical Department of Arkansas University with for-ty-four years' experience in the practice of medicine, testified that he examined Grammer and diagnosed the case as one of pneumoconiosis; that the disease has been known to the medical profession for a long time; that it is produced by breathing irritating dust throughout a long period of time; that air containing silica, iron, copper and emery steel dust is irritating and injurious to the delicate tissues of the lungs; and that, in his opinion, breathing gases along with the fine coke dust encountered in the stills in question would act as such an irritant.

E. D. Murphy, safety engineer of the defendant and active in the work of the National Safety Council, attended meetings of that organization from time to time. He testified that the danger of toxic gases in stills of this kind had been the subject of discussion at some of the meetings; that he was chairman of the Mid-Continent division of the petroleum section of the council during the year 1928; that he contributed some of the material used in the preparation of a bulletin issued by the organization entitled "Safe Practices in Cleaning Petroleum Stills"; and that he was familiar with the contents of the bulletin. Plaintiff offered the bulletin in evidence. Defendant's objection thereto was sustained. It contains the following:

"The safety of the men entering a still to clean it is largely dependent, (a) on its having been pumped as dry as possible, (b) on the thoroughness of the steaming to remove all oil vapors, and (c) on adequate ventilation to cool it to a workable temperature and supply clean air for breathing.

"Why? Because the principal hazards involved in any still-cleaning operation are:

"a. Presence of oil which may give off harmful vapors.

"b. Presence of vapors which may explode.

"c. Presence of vapors which may cause asphyxiation.

"d. Temperature which may cause injury to workers or cause prostration.

"e. A fire in area outside still that may trap still cleaners.

"Still cleaners must not guess. If in doubt consult the stillman or some one in authority. Know that conditions are safe."

Bulletin No. 231, published by the Bureau of Mines, Department of the Interior, in 1925, entitled "Investigation of Toxic Gases from Mexican and other High-Sulphur Petroleums and Products," produced at the trial

from the files of defendant and introduced in evidence, contains the following excerpts:

"In the laboratory study, the symptoms of hydrogen sulphide (H2S) poisoning in animals and men were found to be almost identical with those caused by gases in the refineries. The need for a definite method of treating H2S poisoning was evident.

"Two distinct types of accidents are caused by gases from high-sulphur crudes—asphyxia and irritation. The degree of poisoning ranges from comparatively mild cases to those resulting in death. The cases of asphyxia were found to be acute poisoning; the cases of conjunctivitis, pharyngitis, and bronchitis were sub-acute.

"In the cases of asphyxia in refineries, the men had been exposed to a gas that caused almost immediate unconsciousness, and some men died before they could be rescued. Other men who were rescued and given treatment, recovered almost immediately, although a few of them complained of headache and nausea for several hours.

"Conjunctivitis, pharyngitis, or bronchitis usually occurred after exposure to low concentrations (0.005 to 0.02 per cent) of the gas for several hours; occasionally, however, they resulted from an exposure of 5 to 10 minutes to a relatively high concentration (0.05 to 0.06 per cent) of gas. These symptoms of poisoning may not appear for some hours after exposure.

"Men who had been opening lids of look boxes to get samples in a receiving house for Mexican distillate complained of irritation and inflammation of the eyes, and were treated by the plant physician for conjunctivitis. A small amount of gas escaped from the look boxes.

"A machinist, nine years in service, was repairing a continuous still. Gases from the still blew into his eyes, and a painful inflammation of both eyes developed. The plant physician treated the eyes with argyrol for conjunctivitis. The man lost no time and felt no further bad effects.

"Men cleaning a tank that had contained Mexican crude-oil distillate but had been steamed and declared safe developed severe conjunctivitis the next day. Some had felt burning pains in the eyes after working several hours. One, who had worked in the tank all night, had an extremely severe case. The cornea was lusterless and pained exceedingly; he suffered marked lacrimation (watering of the eyes) and photoprobia (light-shyness). He was placed under the care of a specialist, but even with treatment, the exposed part of the cornea desquanated (layers of the eyeball separated) and peeled and for several days the patient was unable to use his eyes. At the end of a week the conjunctivitis cleared up, and his eyes were not permanently affected. The specialist said that the extent of temporary injury seemed out of all proportion to the exposure.

"Five men were working at pressure stills containing Mexican distillate where a leak in the gas line allowed a little gas to escape. The following day the men complained at the dispensary of pains in the chest and a dry cough. The cases were diagnosed as bronchitis. The men did not lose any time, but were under the care of the plant physician for three or four days before all of them were entirely relieved.

"Preliminary studies of the toxicity of H2S indicated that men could not safely be used as experimental subjects, because of possible serious injury to the lungs, and the narrow margin between consciousness and unconsciousness, and the latter and death. Some men were exposed for short periods to H2S in low concentration; however, and the results obtained, considered with the results reported in the work of Lehmann, gave enough data to predict the reaction of men to higher concentrations.

"In the experiments on toxicity, canary birds, white rats, guinea pigs, dogs and goats were used. The birds were selected because of their extreme susceptibility to poisonous gases, and the goats for their resistance. All were healthy and representative of their kind. The symptoms and pathological changes obtained in animals as a result of exposure to H2S may be assumed to apply also to men.

"The poisoning produced by different concentrations of H2S may be divided into two classes: Acute, resulting in almost instantaneous asphyxia with seeming respiratory paralysis; and subacute, resulting in irritation, principally of the eyes and the respiratory tract; with irritation followed by depression of the central nervous system. A concentration of H2S a few hundredths of 1 per cent higher than that causing irritation can cause asphyxia.

"This study on toxicity demonstrates that animals of the types and sizes studied are quite susceptible to H2S poisoning, and that these animals show very similar symptoms. These symptoms are comparable to those in men exposed to low concentrations, and to those reported as occurring in accidents from H2S poisoning in industrial plants.

"Poisoning by H2S is of two types, acute and subacute, respectively, causing asphyxia

and irritation (conjunctivitis, bronchitis, pharyngitis). Death from asphyxia is caused by paralysis of the respiratory center; death from subacute poisoning is associated with edema of the lungs. The pathology in subacute cases is typical, and indicates destruction of the lining of the lungs and inflammation."

The bulletin refers specifically to toxic gases contained in so-called high-sulphur petroleum, but it was enough to suggest sharply to defendant the presence of such gases—doubtless in less quantities—in the sweet petroleum which it was engaged in processing in the stills in question and their harmful effect upon employees encountering them.

It was the duty of the court in passing upon the motion for a directed verdict to view the evidence in its aspect most favorable to plaintiff. Hampton v. Des Moines & C. I. Ry. Co. (C. C. A.) 65 F.(2d) 899; Kroger Grocery & Baking Co. v. Yount (C. C. A.) 66 F.(2d) 700; Chesapeake & O. Ry. Co. v. Ringstaff (C. C. A.) 67 F.(2d) 482; Laughlin v. Chesapeake & O. Ry. Co. (C. C. A.) 68 F.(2d) 242.

It is my conclusion that when thus viewed, the evidence was sufficient to establish prima facie the existence of a latent danger inherent in the employment. That danger did not consist in merely breathing air containing carbon dust. As stated by the majority, inhaling carbon dust alone may not be harmful. The hazard consisted in breathing air filled with carbon dust laden with gases. It was that combination of elements which created the danger. The evidence was enough to show that scientists had known of that danger for many years. Grammer did not. He worked for more than ten years in its presence without being warned of its existence. Death resulted. Defendant was charged in law with knowledge of the hazard since the elements constituting it were known scientific facts. Failure to warn in such circumstances constitutes actionable negligence. Wagner v. Jayne Chemical Co., 147 Pa. 475, 23 A. 772, 30 Am. St. Rep. 745; Fritz v. Elk Tanning Co., 258 Pa. 180, 101 A. 958; Green v. Standard W. P. & A. W. (D. C.) 29 F.(2d) 746; Kane v. Federal Match Corp. (D. C.) 5 F. Supp. 507; Louisville & N. R. Co. v. Wright, 183 Ky. 634, 210 S. W. 184, 4 A. L. R. 478; Collins v. Pecos & N. T. R. Co., 110 Tex. 577, 212 S. W. 477, 222 S. W. 156; Chicago, R. & I. P. Ry. Co. v. Cheek, 105 Okl. 91, 231 P. 1078. In such circumstances, defendant should not be heard to say that it did not know of the danger. The evidence likewise was adequate, if believed, to enable the jury to determine the proximate cause of the employee's death without resort to speculation. The motion for a directed verdict should have been overruled. Entertaining these views, I must be content to occupy the domain of dissent.