**BOAL v. ELECTRIC STORAGE BATTERY CO.**

**No. 6440.**

Circuit Court of Appeals, Third Circuit.

Aug. 25, 1938.

Henry W. Balka, Milford J. Meyer and Robert M. Bernstein, all of Philadelphia, Pa., for appellant.

John Arthur Brown, Joseph J. Brown, and D. Alexander Wieland, all of Philadelphia, Pa., for appellee.

Before BUFFINGTON, DAVIS, and BIGGS, Circuit Judges.

DAVIS, Circuit Judge.

The plaintiff, Boal, after having worked for more than 10 years as a "pickler" in the defendant's storage battery plant in Philadelphia, Pennsylvania, developed a cancer on the under right side of his tongue. He brought this suit to recover damages for his injury on the ground that the cancer was caused by the inhalation of a sulphuric acid mist or spray in the pickling rooms in which he worked, and that the defendant was negligent: 1. in failing to warn him of this danger, 2. in failing to provide ventilating facilities, or 3. in failing to take any other precautionary measures for his safety.

The case first came to trial before a judge and jury, but the jury was unable to agree and was dismissed without having reached a verdict. In the second trial the jury was waived, and the plaintiff offered in evidence the record of the previous trial. The defendant then moved for a nonsuit. Believing that the evidence did not make out a prima facie case and would not sus-

tain a judgment, the District Court granted the defendant's motion and accordingly entered judgment of nonsuit.

■ The main question here is whether or not the evidence would have sustained a judgment for the plaintiff. In deciding this question the plaintiff is entitled to the most favorable inferences deducible from the evidence, and to the rejection of the unfavorable ones. 4 C.J. 764; 5 C.J.Secundum, Appeal and Error, §§ 1671, 1672, pp. 788 to 792; Corbalis v. Newberry Tp., 132 Pa. 9, 19 A. 44, 19 Am.St.Rep. 588; Shoemaker v. Williams, Pa.Super., 200 A. 255; Schroeffel v. Great Atlantic & Pacific Tea Co., Pa.Super., 200 A. 694.

■ In order to prevail, the plaintiff had to prove that he was injured, that his injury was caused by the defendant's negligence, and that he was not prevented from bringing this suit against the defendant by the provisions of the Workmen's Compensation Act of Pennsylvania. 77 Purdon's Pennsylvania Statutes, § 1 et seq.

■ As the plaintiff's injury arose in Pennsylvania, the law of that state controls the issue involved. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. ——, 114 A.L.R. 1487, decided April 25, 1938.

The defendant does not dispute that the plaintiff is suffering from cancer. The uncontradicted testimony shows that his condition is so serious that he will probably die within a relatively short time.

■ For more than 10 years the plaintiff worked for the defendant as a "pickler" in one or the other of the two pickling rooms in the defendant's plant in Philadelphia, Pennsylvania. The process of pickling used in the plant involved the immersion of lead plates or "grids" in a bath of sulphuric acid mixed with water. The strength of the solution was usually about 18% acid to 82% water. These lead plates were first treated with a paste of lead oxide in an adjoining room and were then brought into one of the two pickling rooms, each of which contained 30 to 40 large tanks capable of holding from 1000 to 1500 plates. The plates were arranged in the tanks on wooden racks or "skids" which kept them apart in order to allow the sulphuric acid solution to surround each plate completely. After they had been so arranged, the sulphuric acid solution, which had already been prepared in an adjoining room, was introduced into the tanks by means of pipes and valves. It took approximately 30 minutes to fill a tank with this solution. The plates were allowed to remain immersed in the bath for varying periods (sometimes as long as 24 hours) during which the solution was occasionally strengthened by the addition of concentrated sulphuric acid. After the plates had been pickled for a sufficiently long time, the acid solution was drained from the tanks but almost invariably an inch or two remained on the bottom. The plaintiff and the other picklers then removed the plates while still damp and placed them on trucks. The wooden racks were also removed and piled up in some place in the room out of the way. The plates and the racks were allowed to dry in the pickling rooms.

As a result of this operation, the evidence indicates that there existed in these rooms a spray or mist of sulphuric acid which caused coughing, dryness of the mouth and smarting of the skin.

Eminent and respected doctors, dentists, toxicologists and chemists testified that this mist was the proximate cause of plaintiff's cancer. Dr. Calvin Smyth, a surgeon connected with the Abington Hospital in Montgomery County, Pennsylvania, in response to a hypothetical question, testified that, "in my opinion, if the facts concerning the condition of this man's employment were as they have been related to me, I believe that he developed an ulceration in his mouth as a result of the long continued exposure to sulphuric acid"; that "the man had cancer because of the unhealed ulcer and the ulcer was exposed to a condition of irritation", and that, "I think that in this man's case" the soreness in his mouth resulted from "exposure to sulphuric acid fumes over a long period of time". Dr. Basil R. Beltran, associate professor of surgery in the graduate school of the University of Pennsylvania, Chief surgeon to the Misericordia Hospital, Philadelphia, and the Fitzgerald Mercy hospital at Darby, testified, that the sulphuric acid fumes in the air of the pickling rooms "acted as an irritation to the mucous membranes of the mouth"; "that this irritation after a prolonged time caused an ulcer formation", and that "the cancer developed from the ulcer". Dr. Emanuel Moreno, a dentist, who had treated the plaintiff's teeth, testified that his teeth and gums had absorbed some chemical as a result of breathing fumes of some sort. Dr. Robert B. Cadman, pathologist for the Chestnut Hill Hospital, testified that the

existence of the mist or spray of sulphuric acid solution in the rooms would cause dehydration of the cell; that it would cause changes in the secretions and juices of the mouth which would upset the cell function so that they could no longer manufacture hormones or enzymes "upon which the common economy of the tissue" depends. Dr. Max Trumper, author of scientific works and chemist and specialist in industrial toxicology, testified that it would cause physical damage by irritation to these cells; that the "normal course would be * * * irritation, repair, irritation, repair" until at some time "this tolerance breaks.down and you get specific symptomology, the specific effects of irritation which eventually will give rise to ulceration, because that means a break-down of the biological mechanisms to neutralize this repair to overcome this persistent and protracted chemical trauma. * * *".

This evidence is clearly within the standard of proof required under Pennsylvania law. Vorbnoff v. Mesta Mach. Co., 286 Pa. 199, 133 A. 256; Johnston v. E. E. Orcutt Garage, 103 Pa.Super. 507, 157 A. 46.

■ The next question is whether or not the defendant was negligent in failing to warn the plaintiff of the danger, and in failing to provide ventilating facilities or to take other precautions to protect the plaintiff.

There is no dispute about the fact that the defendant failed to warn the plaintiff and to provide ventilating facilities. However, the defendant contends that this failure does not constitute actionable negligence for the reasons that the precautionary measures for the safety of its employees in its plant and process came up to the general standards prevailing in the industry; that the danger, if any, was one of which it did not and could not know and that there was no record that any other case of cancer ever developed from exposure to sulphuric acid fumes or mist.

The evidence does not sustain these contentions. In the first place, the precautions taken by defendant for the safety of its employees while working in its plant did not come up to the standards prevailing in the industry generally. As stated above, the plates and the wooden racks were allowed to dry in the pickling rooms. This, Dr. Trumper testified, "is really the vice or error in the case, or in this working condition. In other words, in no pickling process in any industry is the material permitted to dry in the same room that the worker is actively pickling his metal. In fact, a common procedure in the pickling of metal is to transfer the metal to a conveyor right at your pickling vat and that carries it away automatically, and in that conveyor system an exhaust system or some warm air system so that these mists do not get into the air." Dr. Franklin D. Jones, a chemist of wide experience, testified that when the plates were allowed to dry in the pickling rooms, the very movement of the air was "bound to produce a certain amount of entrainment of sulphuric acid solution in the air" in the form of fine bubbles, and that the wood racks or stretchers, when drying, produced wood dust with sulphuric acid on the particles thereof.

It follows that those cases, such as Grammer v. Mid-Continent Petroleum Corp., 10 Cir., 71 F.2d 38, which hold that an employer is relieved of liability to his employees if the provisions in his plant for their safety meet the standards prevailing in the industry generally, are not applicable to the facts of this case.

■ In the second place, the evidence shows that the existence and danger of this spray could have been known by the defendant if it had exercised due and proper diligence which the law required of a reasonably prudent person. There existed on this subject general scientific knowledge which the defendant could have ascertained from various publications and persons acquainted with the art if proper inquiry had been made.

Dr. Max Trumper referred in his testimony to a book on "Noxious Gases and the Principle of Respiration Influencing Their Action", from which he read the following quotation: "When hydrogen is evolved from a sulphuric acid solution, the bubbles of gas carry into the air a finely divided spray of the acid. The air may become contaminated with this thin mist of sulphuric acid during the charging of lead storage cells or in the pickling of metals with sulphuric acid."

Dr. Franklin D. Jones testified that the "Mechanical Engineers' Handbook" written by H. L. Miner, head of the Safety Department of E. I. duPont de Nemours, mentions among the dangers of handling sulphuric acid, "irritation or inflammation of the mucous membranes of the nose, throat, and mouth; and also some attack on the teeth through softening of the dentyne". Dr. Robert B. Cadman testified that "sul-

phuric acid is notorious for causing a type of ulcer which is indurating and doesn't tend to heal", and that "even in very low concentrations there would be definite damage done to the person breathing these fumes". Dr. Calvin Smyth said: "I think if the acid was in sufficient concentration to cause irritation to the skin, it certainly might be expected to produce irritation on the mucous membrane." As far back as 1917, the Pennsylvania Supreme Court allowed recovery of damages for poisoning resulting from the inhalation of sulphuric acid fumes. See Fritz v. Elk Tanning Co., 258 Pa. 180, 101 A. 958.

Under these circumstances, it makes no difference whether or not the defendant was actually aware of the danger for it is "charged with the knowledge of * . * * the nature of the constituents and general characteristics of the substances used in his business, so that he can give directions for the conduct thereof with ordinary safety to his servants performing the work with ordinary care". 39 C.J. 491, 492; Wagner v. H. W. Jayne Chemical Co., 147 Pa. 475, 23 A. 772, 30 Am.St.Rep. 745. .

■ The defendant points out that the various expert witnesses could not recall any other case in which the inhalation of sulphuric acid fumes or mist actually resulted in cancer. This, however, is not conclusive for the effect of this mist upon different persons would vary, according to their physical resistance. Furthermore, where a danger is known to exist or the employer is presumed to know of its existence, it is not necessary that the employer "should have contemplated or should have been able to anticipate the particular consequences, the form of the accident or the nature of the injury, and where the act or omission of the master threatened danger, the fact that the accident itself was unusual, extraordinary, or even unheard of, does not relieve him from liability." 39 C.J. 290; Dulligan v. Barber Asphalt Paving Co., 201 Mass. 227, 230, 231, 87 N.E. 567; Fletcher v. Ludington Lumber Co., 142 La. 151, 155, 76 So. 592.

■ The final question is whether or not the plaintiff is prevented by the provisions of the Workmen's Compensation Act of Pennsylvania, supra, from maintaining this suit in tort. If he is entitled to recover compensation under the Act, his remedy thereunder is exclusive (77 Purdon's Pennsylvania Statutes, § 481), but if he is not so entitled to recover he may maintain this suit as "his common law remedy". Billo v. Allegheny Steel Co., 328 Pa. 97, 195 A. 110, 114.

■ It is clear under the law of Pennsylvania that "occupational diseases" are not compensable under that Act. Mauchline v. State Ins. Fund, 279 Pa. 524, 124 A. 168; Plazak v. Allegheny Steel Co., 324 Pa. 422, 188 A. 130; Billo v. Allegheny Steel Co., supra; Kane v. Federal Match Corp., D. C., 5 F.Supp. 507. The defendant, however, contends that the plaintiff is not suffering from an "occupational disease" because cancer is not a disease known by "common experience" to result from plaintiff's occupation. Section 223 of Schneider's Work on Workmen's Compensation Law.

■ There is nothing said in any of the Pennsylvania cases cited by counsel or discovered by independent research which indicates that the definition of "occupational diseases" is limited to those diseases which are known "by common experience" to have resulted from a certain occupation. The Pennsylvania courts seem to have adopted the broader definition given by Dr. Thompson in his work on Occupational Diseases in which he defines them as "maladies due to specific poisons, mechanical irritants, physical and mental strain, or faulty environment, resulting from specific conditions of labor. * * * They arise from a great variety of poisons, irritating substances, and exposure to unusual physical conditions". The Circuit Court of Appeals for the Sixth Circuit has adopted the same definition. Zajkowski v. American Steel & Wire Co., 258 F. 9, 6 A.L.R. 348.

If we accept the definition given in Schneider's work, that would not settle the question as to whether or not the plaintiff's disease is compensable under the Act.

The Workmen's Compensation Act of Pennsylvania provides for compensation "for personal injury * * * by an accident." 77 Purdon's Pennsylvania Statutes, § 431. It has been held that "to be an accident, within the Workmen's Compensation Law, the injury must usually result from some undesigned event occurring at a particular time". Mauchline v. State Ins. Fund, supra (124 A. page 169). Under the law of Pennsylvania the distinction is not between "occupational diseases" and other diseases of gradual development, but between diseases of gradual development and those caused or aggravated by some accident, the former not being compensable

under the act. This same distinction is true under the compensation of other states for where "occupational diseases" are not comprehended under the term "injuries", diseases other than occupational diseases, are not so comprehended. 79 C.J. 589. An employee does not assume "the risk of an occupational disease to such an extent that he cannot resort to his common law remedy to secure compensation, provided the disease, whether occupational or otherwise, arose from negligence on the part of the employer". Billo v. Allegheny Steel Co., supra (195 A. page 114.)

The evidence shows that the plaintiff's disease did not result from "an accident", but from exposure to sulphuric acid mist over a long period of time. He is, therefore, not precluded by the provisions of the Workmen's Compensation Act of Pennsylvania from maintaining this action on his common law remedy in tort.

The judgment of nonsuit for the defendant is reversed and a new trial awarded.