**WILDWOOD MINK RANCH, a Minnesota corporation, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. 3-62-Civ. 87.**

United States District Court
D. Minnesota,
Third Division.

March 8, 1963.

R. Donald Kelly, of Donahue, Thompson, Kelly & Smith, St. Paul, Minn., for plaintiff.

Patrick J. Foley, Asst. U. S. Atty., Minneapolis, Minn., for defendant.

LARSON, District Judge.

The plaintiff brings this case under the Federal Tort Claims Act, which makes the United States liable under the local law of the place where the tort occurs, for the negligent or wrongful acts or omissions of federal employees within the scope of their employment "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C.A. §§ 1346(b), 2671 et seq.

## FACTS

The facts as developed by the evidence at trial are contained in the Findings of Fact 43 in number and will not be repeated here. A controverted issue is the altitude of the two Navy planes in the flight over or near the area of plaintiff's mink ranch. Commander Knott, the lead pilot, did not testify. Captain McCaughey was the sole witness for the defendant.

There was credible testimony that the planes flew below 1,000 feet. Captain McCaughey admitted that it was possible that the two jet fighter planes flew over the mink ranch, but denied that they ever got below 1,000 feet until they entered the traffic pattern for landing. I have rejected Captain McCaughey's testimony for several reasons. The incident occurred a long time ago and the Captain has since made many flights into many

cities. In this vein, it is worthy of note that Captain McCaughey did not recall crossing the large St. Croix River shortly before reaching the metropolitan area. Second, Captain McCaughey was the wing man and was thus required to keep close watch on the lead aircraft, leaving him little time for looking at his altimeter. The Captain undoubtedly was particularly concerned about the welfare of his teammate on the day in question. I am confident, however, that Captain McCaughey would neither misrepresent his knowledge of the facts nor knowingly violate flying regulations. He possessed a thorough knowledge of the latter and his general bearing and demeanor were unimpeachable. His conduct at the trial was such as to give pride to the Blue Angels, the Armed Services and his country.

### LIABILITY

One of the arguments advanced by the plaintiff in this case is that the Government is liable under Section 360.012(4) of the Minnesota Statutes, which is as follows:

"Subd. 4. The owner of every aircraft which is operated over the lands or waters of this state is absolutely liable for injury or damage to persons or property on the land or water beneath, caused by the ascent, descent, or flight of the aircraft, or the dropping or falling of any object therefrom, whether such owner was negligent or not, unless the injury or damage is caused in whole or in part by the negligence of the person injured, or of the owner or bailee of the property damaged. * * *"

The Government argues that this provision is inapplicable for two reasons. The first is that the Congress has created public highways in the navigable airspace above the earth in this country and that this legislation confers a public right of freedom of interstate air navigation. See United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); Matson v. United States, 171 F.Supp. 283, 145 Ct.Cl. 225 (1959); 49 U.S.C.A. § 176 et seq. From this premise it might follow that the Congress had pre-empted the right of the States to legislate with respect to the navigable airspace, compare Garner v. Teamsters, Chauffeurs & Helpers Local 776, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953), or that such legislation unduly burdened interstate commerce. See e. g., Southern Pacific Co. v. Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). Although there is some indication that this latter proposition has been rejected by the courts in cases involving airplanes crashing into the ground, see e. g., Adler's Quality Bakery v. Gaseteria, 32 N.J. 55, 159 A.2d 97 (1960); Prentiss v. National Airlines, 112 F.Supp. 306 (D.N.J.1953); Annot. 81 A.L.R.2d 1058, 1059 (1960), there is no need to decide the question for the Government's second argument against absolute liability seems adequately persuasive. The case of Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1952) seems to have decided that the Act "is to be invoked only on a 'negligent or wrongful act or omission' of an employee" and not on the theory of absolute liability without fault. 346 U.S. at 44, 73 S.Ct. at 972. 97 L.Ed. 1427. Doubt is cast upon this principle by language appearing in United States v. Praylou, 208 F.2d 291 (4th Cir., 1953), cert. denied 347 U.S. 934, 74 S.Ct. 628, 98 L.Ed. 1085, but that case has been construed (properly, it would seem) to mean that the mere fact that absolute liability under State law may be imposed against individuals for certain dangerous activities does not relieve the Government from liability under the Tort Claims Act where the misfeasance thereby required is established. Barroll v. United States, 135 F.Supp. 441, 450 (D.Md.1955).

The Government strongly argues that there can be no negligence here for the reason that these pilots had no knowledge of this mink farm or of the whelping season and that no reasonable pilot similarly situated would have had such knowledge. As the Supreme Court emphasized in the Dalehite case supra, 346 U.S. at 42, 73 S.Ct. at 971, 97 L.Ed. 1427, " 'There must be knowledge of a danger, not mere-

ly possible, but probable,' MacPherson v. Buick Motor Co., 217 N.Y. 382, 389, 111 N.E. 1050, 1053." The plaintiff relies on the fact that notice was given to the Navy of the location of the mink ranch and the onset of the whelping season and that the word MINK was prominently displayed on the ranch's barn. A word should be said about this sign first. These jets were traveling fairly fast when they approached this ranch. Their speed was not even close to that of which they were capable but it was probably such as to prevent their effectively maneuvering away from the ranch so as not to disturb the mink even if they saw the sign (which they never did). Thus it seems clear as a practical matter that if these jets were to have avoided this ranch, they would have had to know of its whereabouts before they got close to it and probably before they even left the ground. The wing man, Captain McCaughey, testified that neither he nor any of the team was briefed as to the location of mink ranches in the local area. The plaintiff argues that these pilots should have been so advised, but it is doubtful whether negligence can be posited on this basis. These pilots were not planning to fly in the local area; they planned to climb quickly to their cruising altitude and go on to Rhode Island. It was possible that these pilots would return to Wold-Chamberlain Field, but it was certainly not probable. The briefing officer probably felt that there was no need to tell these pilots of local hazards for the simple reason that they did not plan to fly locally. The precautions to be taken are a function of the risks likely to be incurred and the magnitude of those risks.

There is also the matter of the warning sign outside the briefing room which these pilots should have seen. The sign said to fly high and avoid the mink farms. Should this sign have prompted these pilots to go back into the briefing room and inquire as to the whereabouts of mink ranches? It would seem not. The sign implied that high flight would avoid the mink farms, and high flight is what these pilots contemplated. When these two pilots were returning to the field at a low altitude, should the leader have recalled the warning sign and inquired by radio as to the whereabouts of nearby mink ranches? These were pilots of the highest order; they were among the finest in their profession. It is arguable that they should be held to a high standard. But on the other hand the pilot of the lead aircraft had just gone through what must have been an extremely disconcerting experience. He had lost his cockpit heat and pressurization, subjecting him to extreme cold and forced breathing. He had very nearly lost his canopy and was perhaps concerned with other possible mechanical malfunctions of his aircraft. It is doubtful whether he should have recalled the mink warning sign—a sign which would not have alerted him to possible dangers at the time he saw it.

The plaintiff, however, advances another theory of negligence—namely that these jets violated a civil air regulation which has the force of a statute and was enacted to protect persons and property on the ground from the danger of low-flying aircraft. The plaintiff relies on Leisy v. United States, 102 F.Supp. 789 (D.Minn.1952), a case in which numerous Navy aircraft flew over the plaintiff's mink ranch at an altitude of 150 feet, causing damage similar to that in this case. The plaintiff's mink ranch was in an uncongested area and the pertinent civil air regulation proscribed flight at an altitude of less than 500 feet over sparsely populated areas. 40 C.F.R. § 60.17(c). Relying on this regulation and M.S.A. Section 360.012(3), Judge Donovan concluded that the plaintiff's damage was caused by the defendant's negligence.

■■ That case seems dispositive of this one. 14 C.F.R. § 60.17(b) proscribes flight at less than 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet from the aircraft when over "congested areas of cities, towns, or settlements. * * *" These jets were traveling at a rate of over four miles per minute. Fifteen seconds prior to

passing over the plaintiff's mink ranch these jets must have passed over either Mahtomedi or Willernie, either of which would have to be described as a settlement or town and perhaps a city. Within one minute after passing over the plaintiff's mink ranch they passed over North St. Paul (population—8,520) and within another minute they were over St. Paul (population—313,411)—all at an altitude of 800 to 1,000 feet. The plaintiff's mink ranch was thus clearly located in a populated area insofar as the flight of these jets was concerned. It is familiar law that violation of a statute (and this regulation has the force of a statute) is negligence per se where the plaintiff is one of a class of persons whom the statute was intended to protect and the harm which has occurred is of the type which the statute was intended to prevent. See e. g., Osborne v. McMasters, 40 Minn. 103, 41 N.W. 543 (1889) (per Mitchell, J.); 13 Dunnell's Digest § 6976 (3rd ed. 1962); Prosser on Torts § 34 (2d ed. 1955). There can be little doubt that this regulation was designed to protect persons and property on the ground from the dangers of low-flying aircraft. There can also be little doubt that the plaintiff and its property (the mink) are in the class which this regulation was designed to protect. There is, however, some doubt as to whether the harm which occurred was of the sort which this regulation sought to prevent. The precise purposes of this regulation are not clear, but it might be argued that it was primarily designed to prevent undue hazard to persons or property on the surface from the danger of aircraft crashing into the ground after engine failure or other malfunction. For example, § 60.17(a) says that flights *anywhere* shall be conducted at:

> "An altitude which will permit, in the event of the failure of a power unit, an emergency landing without undue hazard to persons or property on the surface."

This regulation was violated here and so these pilots were negligent with respect to the danger of their aircraft falling on this mink ranch or any of the thousands of houses in Mahtomedi, Willernie, Birchwood, North St. Paul, or St. Paul itself. The crucial question, however, is whether they were negligent in creating a loud noise which disturbed the mink on this plaintiff's ranch. In other words, these pilots created an undue risk to these mink from the danger of their planes falling upon them. Does it matter that the harm which occurred (excessive noise disturbing the sensitive mink) was of a different sort than that which was readily foreseeable?

The case in this posture recalls the famous case of Palsgraf v. Long Island R. R., 248 N.Y. 339, 162 N.E. 99 (1928) (per Cardozo, J.). There a passenger was running to catch one of the defendant's trains. The defendant's servants, assisting him to board it, dislodged a package from his arms, and it fell upon the rails. The package contained some fireworks, which exploded with some violence. The concussion overturned some scales, many feet away at the other end of the platform, and they fell upon the plaintiff and injured her. The defendant's servants, who were found by the jury to be negligent, could have foreseen harm to the package, or at most to the passenger boarding the train; no harm to the plaintiff could possibly have been anticipated. Judge Cardozo, speaking for four judges on the New York Court of Appeals, said that there was no liability because there was no negligence with respect to the plaintiff. He said in part, "The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." 162 N.E. at 100. If Judge Cardozo had stopped at that point, there would be no problem here. These mink were within "the range of apprehension." But Judge Cardozo opened the door to the idea that when the harm incurred is different from the risk created, then there is no liability. At 162 N.E. at 100, he said:

> "In this case, the rights that are said to have been violated, the interests said to have been invaded, are

not even of the same order. The man was not injured in his person nor even put in danger. The purpose of the act, as well as its effect, was to make his person safe. If there was a wrong to him at all, which may very well be doubted it was a wrong to a property interest only, the safety of his package. Out of this wrong to property, which threatened injury to nothing else, there has passed, we are told, to the plaintiff by derivation or succession a right of action for the invasion of an interest of another order, the right to bodily security. The diversity of interests emphasizes the futility of the effort to build the plaintiff's right upon the basis of a wrong to some one else. * * *"

The American Law Institute has adopted Cardozo's suggestion. See Restatement of Torts § 281, comment g., illustration 3. There is some question, however, whether the courts have followed the restatement on this point. Dean Prosser says that they have not. Prosser, Palsgraf Revisited, 52 Mich.L.Rev. 1, 23 (1953). At note 113 Dean Prosser observes that the contention of the Restatement was advanced by the dissenting opinion of Jaggard, J., in Lesch v. Great Northern R., 97 Minn. 503, 106 N.W. 955, 7 L.R.A.,N.S., 93 (1906), where the plaintiff recovered for mental anguish following the trespassory invasion of her property, but it was rejected by the majority of the court. The Restatement's position has also been bitterly attacked by the commentators. See Goodhart, The Unforeseeable Consequences of a Negligent Act, 39 Yale L.J. 449, 467 (1930):

"If the courts once adopt such a distinction, then we are faced with the terrifying prospect of a whole new series of cases in which it will be necessary to consider whether or not a person has the same interest in his foot and his eye, in his two adjoining houses, in his ship and the cargo which it carries."

Even if these mink had been outside the zone of danger, which they were not,

there is still some question as to whether the Minnesota Court would follow Palsgraf. Compare Renner v. Canfield, 36 Minn. 90, 30 N.W. 435 (1886) and Boyd v. City of Duluth, 126 Minn. 33, 147 N.W. 710 (1914) with Kommerstad v. Great Northern Ry., 120 Minn. 376, 139 N.W. 713 (1913), aff'd 128 Minn. 505, 151 N.W. 177 (1915). See generally Prosser, The Minnesota Court on Proximate Cause, 21 Minn.L.Rev. 19, 31–37 (1936).

It would seem more accurate in this case, however, to inquire whether there can be liability for unforeseen consequences, beyond the original risk, to those within the zone of apparent danger. Some courts hold there is never any duty as to the unforeseeable plaintiff or the unforeseeable damage. See Prosser, Palsgraf Revisited, 52 Mich.L.Rev. 1, 16–19 (1953). The rationale of this position is that the risk which determines the existence of negligence in the first instance limits the recovery for it, and that the same factors which characterize the conduct as wrongful define the scope of liability for its consequences. See e. g., Seavey, Principles of Torts, 56 Harv. L.Rev. 72 (1942) and cases cited in Prosser on Torts 259, fn. 57 (2d ed. 1955). Most courts, however, have answered the previously phrased question in the affirmative. Prosser, supra, at 171. As the United States Supreme Court has recently noted in the case of Gallick v. Baltimore & Ohio R. Co., 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618:

"It is widely held that for a defendant to be liable for consequential damages he need not foresee the particular consequences of his negligent acts: assuming the existence of a threshold tort against the person, then whatever damages flow from it are recoverable. See, e. g., Boal v. Electric Battery Co., 98 F.2d 815, 819 (C.A.3d Cir.); Koehler v. Waukesha Milk Co., 190 Wis. 52, 57–63, 208 N.W. 901, 903–905 (collecting authorities); Restatement, Torts, § 435; 2 Harper and James, Torts, 1139–1140; Prosser, Torts, 260 (2d ed.); Seavey, Mr. Justice

Cardozo and the Law of Torts, 48 Yale L.J. 390, 402–403."

Minnesota is clearly committed to this latter position by Justice Mitchell's famous opinion in Christianson v. Chicago, St. P., M. & O. Ry., 67 Minn. 94, 69 N.W. 640 (1896). In that case two railroad section crews were proceeding down the railroad track on separate hand cars. The car in the rear, the occupants of which had been drinking, began to approach the front car at a fast rate of speed, decreasing the safe distance between the two cars. The plaintiff was riding on the front car, which had nothing to hold onto save the handles which were geared to the wheels and they were moving quite rapidly. When the rear car got within 60 feet of the front car, the plaintiff allegedly became dizzy at seeing the rear car following so closely and fell off. The rear car was unable to stop and the plaintiff was injured. The railroad's defense was that this sort of an injury could not have been reasonably anticipated to result, e. g., those on the rear car could not have anticipated that plaintiff would fall off. In rejecting this argument the Court said, 69 N.W. at 641:

> " * * * if the act itself is negligent, then the person guilty of it is equally liable for all its natural and proximate consequences, whether he could have foreseen them or not. Otherwise expressed, the law is that if the act is one which the party ought, in the exercise of ordinary care, to have anticipated was liable to result in injury to others, then he is liable for any injury proximately resulting from it, although he could not have anticipated the particular injury which did happen. Consequences which follow in unbroken sequence, without an intervening efficient cause, from the original negligent act, are natural and proximate; and for such consequences the original wrongdoer is responsible, even though he could not have foreseen the particular results which did follow."

This rule, which sustains recovery here, has been followed in many subsequent Minnesota cases involving unforeseeable consequences. See e. g., Wallin v. Eastern Ry., 83 Minn. 149, 86 N.W. 76, 54 L.R.A. 481 (1901); Anderson v. Anderson, 188 Minn. 602, 248 N.W. 35 (1933); Dellwo v. Pearson, 259 Minn. 452, 107 N.W.2d 859 (1961) (expressly reaffirmed the doctrine of the Christianson case).

It might be argued here that this civil air regulation was intended to guard only against a particular type of harm (e. g., danger from falling aircraft) and its effect should not be extended beyond the original purpose to create liability for another type of harm (e. g., danger to sensitive mink from excessive noise from low-flying aircraft). See Prosser on Torts 157–58; Restatement of Torts § 286; Gorris v. Scott, 1874, L.R. 9 Exch. 125; Denson v. McDonald Bros., 144 Minn. 252, 175 N.W. 108 (1919). But see Middaugh v. Waseca Canning Co., 203 Minn. 456, 281 N.W. 818 (1938); Prosser supra at 158 (text accompanying fn. 45). This position would seem untenable in this case for several reasons.

The first is that these pilots may have been acting negligently without regard to any of the provisions of 40 C.F.R. § 60.17. At the trial the plaintiff began to develop the theory that the jets had been flown at such a low altitude that they could not have safely landed their aircraft had they incurred engine failure. The Government then countered with testimony that Navy jet pilots are under strict orders to bail out of their aircraft upon engine failure and not to attempt emergency landings under any circumstances. This is all very well, but 40 C.F.R. § 60.17(a) is not concerned primarily with the lives of pilots; it is concerned with "undue hazard to persons or property on the surface." It is perhaps proper for the Navy to tell their pilots to jump out upon engine failure, but that is not the end of the matter. The pilot saves himself by jumping out and actuating his parachute, but the pilotless plane still remains. Do not the people on the ground have a right to

ask that pilots fly at such an altitude that upon engine failure the pilot can turn the aircraft away from heavily populated areas before jumping out? § 60.17(a) cannot be shrugged off with the simple statement that Navy jet pilots do not make emergency landings. In this case these pilots flew at an altitude of 800 to 1,000 feet over this mink ranch, several suburbs and a portion of the City of St. Paul, a city of over 300,000 persons. If either or both of these aircraft had incurred engine failure, their altitude would have left them little time to save themselves, much less opportunity to turn the crippled aircraft toward unpopulated areas where it might crash with less hazard to those on the ground. If these Navy pilots are going to quickly jump out of these jet aircraft upon engine failure, then they ought not to be flying them over heavily populated areas at altitudes anywhere near 1,000 feet unless there is a good reason for it, such as imminent entry into the traffic pattern for landing. Here this mink ranch was 15 miles from Wold-Chamberlain Field and the wing man advanced no sound reason why they were flying so low. In other words, these pilots were probably negligent with respect to persons and property on the ground without regard to any civil air regulation. This view of the case would certainly take it outside the purview of the rule previously mentioned.

The second reason is that it cannot be unequivocally said that the only purpose of 40 C.F.R. § 60.17 is to guard those on the ground from the dangers of aircraft crashing upon engine failure. § 60.17(b) might be argued to be primarily concerned with no more than putting a proper airspace buffer between aircraft and persons and property on the ground. Looking at the provision in this light, it certainly cannot be said that the nuisance of excessive noise was not a factor in the promulgation of this regulation.

Third, there would seem no good reason why flight of noisy jet aircraft at extremely low levels could not result in a recovery on the theory of negligence for bodily harm to persons that resulted from mental anguish. Compare Purcell v. St. Paul Ry. Co., 48 Minn. 134, 50 N.W. 1034, 16 L.R.A. 203 (1892) (recovery for miscarriage caused by negligently inflicted fright and fear of imminent peril of a streetcar collision); Ominsky v. Charles Weinhagen & Co., 113 Minn. 422, 129 N.W. 845 (1911) (recovery for negligently inflicted fright which caused 14-year-old girl to permanently lose her hair). These planes in this case apparently gave some of the witnesses a severe fright. It is certainly foreseeable that extremely loud and unexpected noise of the type presented here would cause mental anguish to persons on the ground, possibly resulting in bodily injury to some. If those human beings could recover for this hypothetical bodily injury, there seems to be no good reason under the Christianson case why those same persons could not recover for somewhat similar damage caused to their mink. If the bodily interest in freedom from excessive noise is protected, it would seem that the property interest is no less valuable.

 In this case the flight of these two jets over heavily populated areas at an altitude of 800 to 1,000 feet was negligence per se. In other words, an unexcused violation of the statute is negligence in itself. The standard of conduct for pilots has been fixed by the FAA pursuant to statutory authority and the trier of fact has no dispensing power with which to relax this standard. Cf. Martin v. Herzog, 228 N.Y. 164, 126 N.E. 814 (1920). The evidence in this case showed no excuse for these pilots having flown so low. The wing man, Captain McCaughey, testified that they wished to fly below 3,000 feet to avoid proximity to commercial air carriers. This was a commendable motive but not one which justified two extremely noisy aircraft going all the way down to 800 feet over populated areas. The wing man's description of the mechanical malfunction of the lead aircraft indicates no reason for extremely low flight, and his other testimony was also devoid of any justifi-

cation based on the canopy difficulty which had occurred. The weather was good and these pilots could clearly see where they were going. In fact, Captain McCaughey testified that they were "threading" their way along between the small settlements that they passed in approaching the metropolitan area. It may have been proper for them to "thread" their way along across the countryside of western Wisconsin, but when they came to a metropolitan area of over one million people it was time to increase the altitude of these noisy aircraft. This same reasoning would be applicable to a discussion of this case in terms of ordinary negligence. The standard of conduct which is the basis of the law of negligence is determined by balancing the risk and the probability and extent of the harm against the expediency of the course of conduct pursued. Restatement of Torts §§ 291–293; United States v. Carroll Towing Co., 159 F.2d 169 (2d Cir., 1947). Here the risk incurred (either from the danger of falling aircraft or from excessive noise) far outweighed any benefit derived from these jets avoiding commercial airways by flying so low.

■ Another theory of recovery also seems applicable to the facts pleaded and proved by the plaintiff here. Section 360.012(3) of the Minnesota Statutes Annotated provides as follows:

> "Subd. 3. Flight in aircraft over the lands and water of this state is lawful, unless at such low altitude as to interfere with the then existing use to which the land or water, or the space above the land or water, is put by the owner, or unless so conducted as to be imminently dangerous or damaging to persons or property lawfully in the land or water beneath. * * * "

This provision was construed in Dahlstrom v. United States, 129 F.Supp. 772 (D.Minn.1955) (per Nordbye, J.) to codify the common law of trespass. This is the view of the American Law Institute also. See Restatement of Torts § 194. In Dahlstrom a plane operated by Fed-

eral employees flew over a field at a height of 100 feet. The plaintiff was loading hay in the field and his horses became frightened and ran away, resulting in his injury. Judge Nordbye observed that a trespassory act was within the purview of the Tort Claims Act, which the Supreme Court had held to require " 'some brand of misfeasance or nonfeasance' upon which to fasten liability." 129 F.Supp. at 774. Judge Nordbye decided, however, that the acts of the pilots there involved were within the discretionary function exception to the statute. This latter holding was reversed by the Eighth Circuit in view of certain decisions handed down subsequent to Judge Nordbye's decision. 228 F.2d 819. That Court ruled that the Government could be held liable if the pilots were negligent, but said nothing about the trespass theory adverted to by Judge Nordbye. Another Court of Appeals, however, has unequivocally adopted the theory of liability under the Tort Claims Act for trespass under circumstances similar to those present here. United States v. Gaidys, 194 F.2d 762 (10th Cir., 1952). There an Air Force plane crashed on the plaintiff's property. The plane had been flying at an altitude of 100 feet even though it was approximately one and one-half miles from the point of take-off at a nearby Air Force base. Flight at this altitude was, of course, in violation of previously mentioned civil air regulations. The provision of the pertinent Colorado statute (Section 4 of the Uniform Aeronautics Act) was the same as M.S.A. § 360.-012(3) here except that it added a third proviso that flight was unlawful if in violation of the air commerce regulations which had been or might be promulgated by the Department of Commerce of the United States. After reviewing these facts, the Court said, 194 F.2d at 765:

> "There can be no doubt that under the law of Colorado a private individual would be liable in damages for injuries occurring under circumstances comparable to those shown here. And we are clear in the view

that the flying of the plane below a safe altitude immediately adjacent to the property of plaintiffs, the crash, and the resulting injuries sustained by plaintiffs, constituted a redressible wrong in the nature of trespass for which the United States is similarly liable under the Tort Claims Act. Compare United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206."

This reasoning also seems persuasive here.

Here M.S.A. § 360.012(3) outlaws flight over the lands of Minnesota "at such low altitude as to interfere with the then existing use" to which the land is being put. In this case this land was being put to residential use and these pilots could clearly see that. It seems clear that flight at 800 to 1,000 feet of two powerful jets traveling at 275 miles per hour is going to interfere with this residential use. Some of the witnesses testified that they were scared out of their wits by the noise that was made. The Minnesota Court has already held that damages can be recovered for mental disturbance resulting from a trespass to land. Lesch v. Great Northern R. Co., 97 Minn. 503, 106 N.W. 955, 7 L.R.A., N.S., 93 (1906). It is familiar law that in trespass to land the trespasser's responsibility reaches to all the damage proximately caused to the property and to the person of the owner. Prosser on Torts 57. The Minnesota statute previously referred to gives the landowner the same rights in a certain part of the air over his head that he has in his land. These jets trespassed in the part of the air that belonged to the plaintiff here. They interfered with the residential use of the property (at the least) and they probably conducted the flight so as to be "imminently dangerous * * to persons or property lawfully in the land * * * beneath." Although the question is not free from doubt, there seems to be no reason why trespassing jet aircraft should not respond in damages for harm caused to mink by loud noise.

The matter of trespass to land by aircraft is discussed in Prosser on Torts at pp. 59–61, where the author noted that at least four distinct theories have been advanced to adjust the conflicting interests of the surface owner and the operators of aircraft. Some of the theories there described have in fact been employed by the Federal courts under the Tort Claims Act cases previously mentioned. The author notes that, "Thus far it cannot be said that any one of the four theories has definitely prevailed, and the decisions do not identify and distinguish them very clearly." Prosser, supra, at 61. Although the law is not crystal clear in this area, it does seem clear that this case is one of either negligence or trespass, or both, and that the intentional operation of these two jets in the manner described was a negligent or wrongful act within the meaning of the Tort Claims Act.

█▋█ The last question is whether the conduct of these pilots falls within the discretionary exception provided by 28 U.S.C.A. § 2680(a). The law on this point seems to be that conduct of a Government employee on a planning level is immune from liability but negligence on the operational level renders the Government liable. Mahler v. United States, 306 F.2d 713, 723 (3rd Cir., 1962); Fair v. United States, 234 F.2d 288 (5th Cir., 1956); Dahlstrom v. United States, 228 F.2d 819 (8th Cir., 1956); Eastern Airlines, Inc. v. Union Trust Co., 95 U.S. App.D.C. 189, 221 F.2d 62 (1955), aff'd per curiam sub nom. United States v. Union Trust Co., 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955); Johnson v. United States, 183 F.Supp. 489, 490 (E.D.Mich.1960); Jemison v. Duplex, 163 F.Supp. 947, 951 (S.D.Ala.1958). The facts that affect this issue are clear. These pilots were told to go from Walla Walla, Washington, to Quonset Point, Rhode Island, but they were not told how to make the flight. They planned their own flights. They decided to make the flight in two segments. If the weather and winds had been different, the trip

might have required more than one stop and they would have overflown Minneapolis. In other words, these pilots had complete operational control over their aircraft. They planned the cruising altitudes for cross-country flights and they computed the distances which could safely be traveled, considering the weather and necessary fuel reserves. Once they had been told where to go, they were on their own. This brings this case squarely alongside Dahlstrom v. United States, 228 F.2d 819 (8th Cir., 1956), where two pilots were flying around an airport measuring the height of the obstacles to flight. Although the flying weather had been excellent, the pilots flew the plane at an altitude of 100 feet directly over a team of horses in a field, causing them to become frightened and run away. The District Court had ruled that the performance of this task fell within the discretionary exception to the Act, but the Eighth Circuit reversed, saying, 228 F. 2d at 823:

"* * * the Government should have been held liable to the injured plaintiff in this case if the Government employees who operated the airplane were negligent in flying it in such close proximity to him and his team. Conceding that the Administration required the pilots to make a survey by twin-engine airplane rather than on the ground and that such survey included low level flying, the question remained whether the pilots in the performance of their work took reasonable care and precaution to carry on their flight so as not to injure persons working like the plaintiff with horses in the open field within a city area. Though there were two of the pilots apparently in position between them to look out for people with teams of horses in open fields as well as for flight obstacles, the record here discloses no action by either of them to guard against the runaway and damage they caused and none is referred to in the Court's opinion. The record is plainly to the effect that the pilots received no specific direction as to any precautions to be taken by them and they were on their own in that regard. Their superior officer testified 'It is up to the pilot to plan his flight and maneuver his aircraft in such a way that he can efficiently and safely perform the work.'"

That language is controlling here. It was up to these pilots to return to Wold-Chamberlain Field after the canopy accident in a manner which would not endanger persons and property on the ground. They were on a VFR clearance and their path of flight was entirely determined by them. They chose to fly too closely to the ground over populated areas and damage occurred. It seems clear that the misfeasance occurred on an operational rather than a planning level and that the Government should respond in damages.

## DAMAGES

The Court has determined the damages to be $9,118.00. Credible testimony of plaintiff's general manager supported by other independent testimony established the loss occasioned by the death of 198 mink kits and 45 female breeders. From the established loss there has been deducted salvage on breeder pelts and the cost of raising the kits. The amount awarded exceeds the estimated claim presented to the Navy and the claim on this part of the case stated in the answers to interrogatories. The proof at the trial, however, supports the award and, if anything, as testified to by several independent witnesses, the claim and the award are modest.

The Court has rejected that part of the claim for damage which relates to the lightening of the herd by mutation. The estimated loss on this part of the claim is $8,233.50. This element of damage does not find support in the evidence. The evidence presented was vague and indefinite. The Court feels also that the damages are conjectural and speculative.

During the trial plaintiff's general manager referred to the loss within the next five to ten days after June 1, 1960, of an additional 443 mink kits having a value of $18.00 each. This element of loss had not been included in the claim to the Navy, in the answers to interrogatories, nor in the Complaint. Ruling on the plaintiff's motion to amend the Complaint was reserved but not made before the close of the trial. By separate written Order the Court has denied this motion.